[No. B205512. Second Dist., Div. Two. Apr. 6, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
IVAN SAMANIEGO et al., Defendants and Appellants.

COUNSEL

Ralph H. Goldsen, under appointment by the Court of Appeal, for Defendant and Appellant Ivan Samaniego.

Janyce Keiko Imata Blair, under appointment by the Court of Appeal, for Defendant and Appellant Carlos Perdomo.

Eric R. Larson, under appointment by the Court of Appeal, for Defendant and Appellant Clifton Christopher Sawyer.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Linda C. Johnson and Michael A. Katz, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BOREN, P. J.**—Ivan Samaniego (Samaniego), Carlos Perdomo (Perdomo) and Clifton Christopher Sawyer (Sawyer) appeal from the judgments entered

upon their convictions of two counts each of first degree murder (Pen. Code, § 187, subd. (a)).[1] The jury found that each appellant committed multiple murders within the meaning of the multiple-murder special circumstance (§ 190.2, subd. (a)(3)) and committed the murders for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)). The jury also found with respect to both murders and each appellant that a principal personally used a firearm (§ 12022.53, subds. (b), (c), (d), (e)(1)). The trial court sentenced each appellant to two consecutive life terms without the possibility of parole plus two consecutive terms of 25 years to life.

Samaniego and Perdomo contend that (1) the trial court erred in excluding third party culpability evidence, thereby violating their rights to present a defense, to due process, and to a fair trial. Samaniego contends that (2) CALCRIM No. 400 erroneously instructed the jury that one who aids and abets is equally as guilty of the crime as the direct perpetrator, (3) CALCRIM No. 1403 erroneously encouraged the jury's impermissible use of gang evidence, and his attorney's agreement to that instruction constituted ineffective assistance of counsel, and (4) his conviction of the Palada murder must be reversed because it is based solely on the uncorroborated testimony of an accomplice. Perdomo contends that (5) the trial court erroneously instructed the jury on the use of circumstantial evidence in accordance with CALCRIM No. 224 instead of CALCRIM No. 225. Sawyer contends that (6) his convictions must be reversed because the trial court erred in refusing to allow the defense gang expert to testify that when one gang member commits a crime his companion gang members do not always possess the same knowledge and criminal intent, (7) the trial court erred in refusing to permit him to introduce evidence that he does not speak or understand Spanish, (8) his abstract of judgment must be amended to reflect that his liability for the direct victim restitution fine imposed is joint and several, and (9) it was improper to impose a parole revocation fine because he was sentenced to life without the possibility of parole. Sawyer and Perdomo each join in the contentions of every other appellant to the extent applicable to them. (Cal. Rules of Court, rule 8.200; *People v. Stone* (1981) 117 Cal.App.3d 15, 19, fn. 5 [172 Cal.Rptr. 445].)

We affirm as modified.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

## FACTUAL BACKGROUND

*The prosecution's evidence*

### Introduction

Appellants were members of the primarily Hispanic Toonerville gang in Tujunga, and they regularly associated with each other. Samaniego was known as "Gangster," Sawyer as "Stranger," and Perdomo as "Silly." Aaron Stapleton, known as "Huero" (Huero), and Gildardo Pena, known as "Shaggy" (Pena), were also Toonerville gang members.

At the corner of Silverton and Valmont in Tujunga was a residence known as the "tweaker house" (tweaker house) because it was frequented by many Caucasian methamphetamine users, called tweakers. Michele Pace (Pace), Luis Vasquez (Luis) and Earl Heim (Heim) resided there. Terri Weitzman (Weitzman), Donald Nelson (Nelson), Josh Green (Green) and Josh Krippner (Krippner) were regular visitors, with Krippner selling drugs there. Shawn Kidd (Kidd), a methamphetamine addict and neighborhood drug dealer, also sold and used drugs at the tweaker house.

At one time Green was a good friend of Sawyer, but they had drifted apart when Green began doing methamphetamines and associating with the tweakers, and when Sawyer began associating with the Toonerville gang. Krippner knew members of the Toonerville gang, including Sawyer and Huero. Kidd was unaffiliated with the Toonerville gang or the tweakers, but was "hanging out" at a house and trailer on Glory Avenue (collectively "the Glory Avenue residence") frequented by appellants and Huero.

### The "Paperwork"

"Paperwork" is a document, such as a police report, that reveals that a person is a "snitch." Before November 6, 2005, people at the tweaker house and everyone in the neighborhood were discussing paperwork that contained the names of Huero and Bonji and that was understood to mean that Huero was "telling on Bonji." Bonji's residence had just been raided by the police. Green had a copy of the paperwork and talked about it to "anyone that would listen." He gave Heim a copy.

Sawyer warned Green that Toonerville gang members were upset with the tweakers for spreading rumors about Huero, and that Green should stay away from them and not mention the paperwork to them.

*The Donald Nelson Murder*

Kidd testified that on November 6, 2005, he first saw the paperwork at the tweaker house, as Green was showing it to someone.[2] Kidd and Green then went in Green's car to buy marijuana from Huero at his residence on Mountair. Huero exited his house aggressively, his hand in his shirt, as if reaching for a gun. He had never before acted this way toward Kidd.[3] Green then took Kidd back to the tweaker house.

Later that day, Green telephoned Kidd and asked Kidd to meet him at the Glory Avenue residence. When Kidd arrived, Green, Perdomo and "Dreamer," a female, were there. Perdomo greeted Kidd with "What's up." Perdomo lifted his shirt and flashed an old "cowboy revolver" in his waistband. Perdomo then aggressively demanded the paperwork from Green, which Green reluctantly gave to him.

Perdomo said that they should go see Huero at Huero's apartment on Mountair. When they arrived, Perdomo spoke briefly to Huero. A few minutes later, a white minivan arrived, from which Samaniego and Sawyer exited with Ashley Harvey (Harvey) and Pena. Pena walked aggressively and threateningly towards Kidd and asked the others, "Is this the guy?" Samaniego responded, "No, he's cool." Samaniego brought up the subject of the paperwork and asked extensively about it and whether Kidd had seen it. Kidd said that he had.

The four Toonerville gang members (appellants and Huero) huddled near the entryway, where neither Kidd nor Harvey could overhear them. The four men and Harvey entered the van and drove off. Kidd, who had already left on his bicycle, saw the van pass him and saw it again five minutes later parked near the tweaker house.

Kidd stopped his bicycle near the driveway of the tweaker house and heard four shots. He initially testified that he saw Samaniego and Perdomo come from Valmont and enter the van after the shots. He only saw silhouettes, but had a pretty good idea who they were from what he observed them wearing

---

[2] While Kidd denied receiving any benefit for his testimony, detectives told him that they would help him get into a drug program if he testified. After becoming a prosecution witness, he was sentenced to the low term in a pending case. Kidd was a little frightened to testify because he was in prison and "snitch[ing]" put his life in danger.

[3] Kidd had previously told Huero of the rumors he had heard about the paperwork, which information angered Huero.

earlier, their height, and their body shape.[4] Kidd entered the driveway and saw several people helping Nelson. Not wanting to be at the tweaker house when the police arrived, Kidd left.

In Harvey's version of the Nelson murder, Harvey testified that she became Sawyer's girlfriend in July 2005 and began staying at his Glory Avenue residence.[5] They used methamphetamines together. She met Samaniego at Sawyer's residence. Sometime in August 2005, she slept with Perdomo. They all began "hanging out" and doing drugs together.

Because appellants had no car, Harvey used her parents' white minivan to drive them around Tujunga. On November 6, 2005, at 10:00 p.m., she drove to the Glory Avenue residence and picked up Sawyer and Samaniego. She then picked up Pena and drove to Huero's apartment where she saw Perdomo and Kidd together on one bicycle. Appellants and Pena had a private meeting and then entered the van and told Harvey to drive to the tweaker house. They wanted to see who was there.

At the tweaker house, Harvey parked a block away. Appellants and Pena told her to wait, exited, and went towards the tweaker house. Harvey heard gunshots in the vicinity of the house within 10 seconds.[6]

Seconds after the gunshots, appellants and Pena ran back to the van and told Harvey to drive to Glory Avenue. They seemed paranoid and apprehensive. At Glory Avenue, they went inside the house, turned off all the lights and locked the doors. Harvey assumed they had shot someone because Sawyer was "freaking out." She did not see any weapons that night, but the next day she saw Perdomo waving a "cowboy gun, revolver." She told detectives she did not recall which appellant had the gun. Harvey did not talk to detectives about the Nelson shooting because Sawyer told her to keep her mouth shut or they would both be dead.

Weitzman, Luis, Heim, and Pace gave similar testimony. They were at the tweaker house on the night of the shooting. Weitzman, Luis, and Heim were

---

[4] Kidd told detectives before trial that it was so dark he could not actually see anyone getting into the minivan, but thought he saw a shadow closing the van door. At the preliminary hearing he testified that he did not see who entered, exited or remained inside of the van.

[5] Harvey was charged with the Nelson and Palada murders. She spoke with detectives many times after her arrest and was not always truthful. When she first spoke to Detective Jose Martinez, she spoke only about the Palada murder. She concealed the fact and extent of her drug use. Before trial, but after she had spoken to detectives, she agreed to testify against appellants in return for being allowed to plead guilty to one count of manslaughter, for which she would serve three years, including time already in custody.

[6] Harvey also testified that it was a few minutes until she heard the gunshots, and she told detectives it was 10 minutes later.

inside the house and Pace was sleeping in her station wagon in the driveway. Approximately 10 minutes after Nelson left the tweaker house, Weitzman went outside to try to persuade Pace to come inside, but Weitzman was unable to do so. Moments later Weitzman noticed five young men, dressed like gang members, standing in the driveway. One of them, wearing a beanie and with a pierced left eyebrow containing a barbell,[7] asked her if Green was there and if they could go inside to check. He was articulate and did not sound like a "cholo." Weitzman said she would check.

Inside, Weitzman told Heim that there were "five angry people" in the driveway asking for Green. As she spoke, she heard four or five gunshots from the driveway. Heim pushed her to the ground and ran outside where he saw Nelson lying in the driveway. Weitzman went outside and saw Heim and Pace standing over Nelson's body. The five young men were gone.

Green was a reluctant witness.[8] He claimed not to recognize the paperwork or remember much about it. He denied ever possessing it, speaking with Sawyer about it, going to Mountair, speaking with Huero on the day of the shooting, showing Kidd the paperwork, or being warned by Sawyer that the Toonerville gang was angry about his spreading rumors. He did tell the prosecutor that Sawyer said he should stay away from Toonerville gang members because the gang was not happy with "white guys" because of the paperwork.

*The Nelson Murder Investigation*

On November 6, 2005, Detective Martinez was called to the tweaker house and found Nelson's bullet-riddled body lying in the driveway. There were no weapons on Nelson or in the vicinity. A green baggie containing a white powdery substance resembling methamphetamine was removed from his mouth.

The coroner determined that Nelson died of multiple gunshot wounds, having sustained five likely fatal wounds. Four projectiles were recovered from his body. There was no sooting or stippling to indicate that Nelson was shot from less than a few feet away.

No shell casings were found at the crime scene. This led Detective Martinez to believe that the murder weapon was a revolver because automatic

---

[7] It was stipulated that Perdomo had a pierced left eyebrow at the time of the offense.

[8] A few months before trial, Green received a telephone call from Sawyer asking for help. Green testified that he "possibly" feared being in court to testify. A few days before testifying, he told the district attorney that you do not come to court about something that has nothing to do with you unless you are "cruisin' for a bruisin'."

and semiautomatic handguns expel casings as they are fired. A firearm examiner examined the four projectiles removed from Nelson's body and determined that they were .22-caliber, long-rifle rounds. This type of ammunition could be fired from rifles or handguns, including revolvers and semiautomatics. While all of the bullet fragments bore similar characteristics, they were too badly damaged to allow the examiner to confirm whether they were from the same gun.

Detectives interviewed Joe Freeman (Freeman), an elderly man, and his daughter, Julie Malcomb (Malcomb), with whom Freeman had lived in Tujunga. Sawyer lived with them for a year and often had friends over, including Perdomo, although Freeman claimed not to know Samaniego or Perdomo. Freeman owned a nine-shot, long-barrel .22-caliber pistol, which he kept in plain view on his nightstand. During the interview, Freeman first realized that his handgun and holster were missing. Detectives searched the house and did not find them.

The day before the police interview, Freeman heard something going on in the backyard. The detectives dug up a holster from the yard at Malcomb's house. At trial, the prosecutor showed Freeman that holster. He denied it was his, though before trial he positively identified it to detectives.

Malcomb recalled a day near the time of Nelson's murder when she was outside of Freeman's room and heard him tell Sawyer and others, including Perdomo, "You better hide it good." When Malcomb asked what was happening, Freeman told her, "Mind your own damn business." Freeman denied making that statement. A day before trial, Malcomb identified Perdomo in a photographic lineup, but misidentified Samaniego as Perdomo at trial.

### The Michael Palada (Palada) Murder

Martin Herrera (Herrera) was a Mexican national, who had been deported but was brought back to the United States for the limited purpose of testifying.[9] He had lived in Tujunga for approximately three years and was a methamphetamine user. He was not a gang member but knew appellants and other members of the Toonerville gang on a casual basis.

On November 30, 2005, Herrera ran into Sawyer and Perdomo in an alley in Tujunga. Herrera noted that Perdomo was wearing blue jeans with a blue

---

[9] Herrera was given formal immunity from prosecution for drug-related offenses in exchange for his testimony. He also expected leniency on a pending charge when he first began to cooperate with Detective Mario Santana.

bomber jacket and a blue baseball cap, while Sawyer was wearing gray cutoff shorts with high white socks, white Nike shoes and a gray sweatshirt.

Herrera was a friend of Palada, who lived on Pinewood Street and made a living selling methamphetamine from his apartment. Herrera assisted Palada by meeting people in the street and taking their money and drug orders to Palada, who would deliver the drugs to the buyer in the street.

Between midnight and 2:00 a.m., on December 1, 2005, Herrera went to Palada's apartment to obtain drugs for his personal use. Palada often gave him small amounts of drugs for his help, but did not then have any. When Herrera began walking home and was 100 yards from Palada's apartment, he turned around and saw three men huddled in the middle of the street near Palada's apartment, talking to each other. Then, one walked toward the mouth of the alley, another toward the apartment and the third remained in the middle of the street.

Based on their body type and on clothing Herrera had seen them wearing earlier, he testified that Sawyer was the person who walked towards Palada's apartment, and Perdomo was the one who remained in the middle of the street. He testified that he believed Samaniego was the third person, by the way he stood, his stature and his form; the third person was heavier and taller than the other two. He had not seen Samaniego that day to know what he was wearing.

Herrera saw Palada come out on his balcony. A loud argument between Palada and Perdomo ensued, but Herrera could not hear what was said. After a few minutes he heard Perdomo yell, "Tirale, tirale," Spanish for "Shoot, shoot." Moments later Herrera heard three gunshots and saw the men run from the area.

After Palada's murder, Herrera first spoke to Detective Brownell and told her that he was too far away to see anything and had no idea who the three people were. He later told Detective Santana that Sawyer and Perdomo were involved in Palada's murder, as he recognized their clothes from earlier in the day, but that Samaniego was not. But he told someone else that it was Samaniego. He did not identify Samaniego initially because Samaniego was in custody with him. In another interview by Detective Santana, Herrera mentioned Samaniego's name. He recalled telling one of the detectives that he thought one of the three men was Samaniego, which meant to him that he was not sure.

Herrera also told Detective Santana that Palada was threatened with a crossbow the day before the shooting. Herrera never heard Sawyer speak Spanish.

Harvey also testified to events relating to Palada's murder. After work on November 30, 2005, she went to the Glory Avenue residence and borrowed a Lincoln Navigator belonging to Wendy Sonn, the owner of the house. Harvey drove appellants to Palada's house because they wanted to tax him for selling drugs. They told her to stop and park on Day Street, a block away from Pinewood. Appellants exited, telling Harvey to remain with the car. They walked down the alley and out of her sight.

After approximately 10 minutes Harvey heard gunshots. Shortly thereafter, appellants came running back to the Navigator. One of them said, "Way to go." They seemed happy and exuberant. When appellants returned to the Glory Avenue residence, they went into the dark house and sat quietly. No one said anything about what just happened. During this incident, Harvey did not see any of appellants with a gun.

The next evening, Harvey saw Samaniego holding a gun. Pena was standing nearby. Harvey drove them and Dreamer to a campground in the mountains. Samaniego told Harvey where to stop, and he and Pena left the car and walked out of sight. When they returned, Harvey dropped them off at their homes.

Abigail Alvaran (Alvaran), Palada's girlfriend at the time of his murder, was frequently at his apartment. She was there the night of the shooting. Herrera came by, and Palada went outside to speak with him. Palada came back inside, and 10 minutes later, there was a knock on the door. He walked onto the balcony to see who was there.

Alvaran was sitting in the living room and could hear two voices besides Palada's. One unfamiliar voice asked if Palada was "slanging." He said he was not. Palada told them to be quiet or his roommate would come down. A voice asked, "Are you paying rent?" Palada answered "no" and repeated that his roommate would be disturbed by the noise. The voices replied with laughter, "Maybe she should go downstairs." A voice said he should be paying rent, to which Palada said, "No." Moments later, shots rang out. Alvaran went to the balcony and saw Palada's body. She did not see anyone else.

*The Palada Murder Investigation*

Palada died of a single gunshot wound to the head. A projectile lodged in the soft tissue of his neck was recovered. A firearm examiner examined the projectile and a number of bullet fragments recovered by police at the scene. The examiner concluded with certainty that the projectile was a .44-caliber. She was also able to conclude that there had been at least three shots fired. She could not confirm whether any of them had been fired from the same

gun, though the fragments and projectile were consistent with having been fired from a single weapon.

Detective Santana recovered a white Nike tennis shoe at the scene of the shooting. The parties stipulated that the shoe was tested for genetic material and determined to have been worn by Sawyer.

*The Gang Evidence*

Officer Charles Dinse testified as a gang expert. He focused on the Toonerville gang. That gang had a clique in Tujunga and other places. Its gang color was blue, and gang members wore Dodger clothing and anything displaying the letter "T." The gang engaged in a pattern of violent felony conduct, including the sale of narcotics, murder, attempted murder, robberies, carjackings, kidnappings, possession of firearms, and grand theft auto. Two of its members were recently convicted of felonies; one for attempted robbery in July 2005 and one for attempted murder that same year. In Dinse's opinion, appellants and Pena were all members of the Toonerville gang. Based on Harvey's involvement in the Nelson and Palada murders, he also opined that she was a member.

Officer Dinse explained that gang members often retaliate against snitches. Huero's name on the paperwork was enough to suggest that he was a snitch. Officer Dinse opined in response to a hypothetical based upon the evidence introduced regarding the Nelson murder that that murder was committed for the benefit of a criminal street gang. He explained that Green and Krippner were passing out the paperwork and fueling rumors that Huero was a snitch, which would be perceived to be manifesting disrespect toward a Toonerville gang member. He concluded that the murder was to retaliate for that disrespect because four members of the gang acted in concert to commit it, it took place in gang territory, and Nelson was shot six times, indicating an intent to send a message of fear. He also said that the fact that appellants were looking for Green but shot Nelson did not alter his opinion. A shooting of any man in the gang territory enhances the gang's status by sending a message that disrespecting the gang or calling police will result in being shot. In an apparent explanation of why appellants did not kill Weitzman when they saw her first after they arrived at the tweaker house, Officer Dinse stated that killing females in gang culture is frowned upon because it causes too much negative publicity for gangs and causes law enforcement to focus attention on them.

In response to another hypothetical based on the evidence presented, Officer Dinse testified that the Palada murder directly furthered the interests of the gang. His opinion was based upon the facts that three gang members

were working in concert to commit the murder, and gangs finance their activities by "taxing" drug sales within their territories. In his opinion, the Toonerville gang had learned of Palada's drug sales, had confirmed it with Huero when he made a buy at Palada's house the day before and had gone to the place to pressure Palada to pay taxes. Murder sends the message to all drug dealers not to sell in the gang's territory without paying tax. Also, a walkup shooting is bolder than a driveby shooting, further enhancing the perpetrator's reputation.

*Defendants' evidence*

Alex Alonso (Alonso), a Ph.D. candidate in geography, spent many years mapping Los Angeles County gang territories. He testified that "the majority of crimes that gang members commit are not for the benefit of the gang." When a group commits a gang crime, it is customary for them to yell out their gang's name or leave gang graffiti at the scene. Usually the perpetrators want the other side to know who committed the crime. Sometimes gang graffiti is written, even on the victim, to denote the gang's involvement. Factors to consider in deciding if a crime is for the benefit of the gang include (1) the identity of the victim, (2) the relationship between the assailant and the victim, (3) yelling the gang name, and (4) the number of gang members involved in the crime, although one gang member can commit a crime for the benefit of the gang. On cross-examination, Alonso admitted that paperwork is a form of gang disrespect and that not all crimes for the gang's benefit occur with a callout or claim of gang responsibility.

## DISCUSSION

### I. *Instructional Errors*

#### A. *CALCRIM No. 400*

##### 1. *Background*

The prosecutor's theory with regard to the Nelson murder was that appellants drove to the tweaker house intending to find and kill Green. When he was not there, they benefitted the gang by killing Nelson. But there were no eyewitnesses to the actual shooting of Nelson or Palada and therefore no evidence as to which appellant was the direct perpetrator.

The trial court therefore instructed the jury on the general principles of aiding and abetting in accordance with CALCRIM No. 400, as follows: "A person may be guilty of a crime in two ways. One, he or she may have directly committed the crime. . . . Two, he or she may have aided and abetted

a perpetrator, who directly committed the crime. A person is *equally guilty* of the crime whether he or she committed it personally or aided and abetted the perpetrator who committed it." (Italics added.) No objection or request for clarification or modification of this instruction was made. The trial court also instructed the jury on both premeditated, first degree murder and unpremeditated, second degree murder, giving the jury the option of finding appellants guilty of killing Nelson without deliberation on the spur of the moment.

### 2. Contentions

Samaniego contends that the trial court erred in instructing the jury in accordance with CALCRIM No. 400. He argues that that instruction is defective in failing to inform the jury that an aider and abettor can be guilty of a lesser crime than the perpetrator. If the shooter committed premeditated, first degree murder, CALCRIM No. 400 required the jury to convict appellants of first degree murder as aiders and abettors regardless of their mental state, thereby eliminating the need for the jury to make factual determinations regarding appellants' intent, willfulness, deliberation and premeditation. "The overriding rule is that an aider and abettor's liability is dependent on his or her unique mental state. If that mental state is not the same as the perpetrator's mental state, then the aider and abettor is not 'equally guilty.' "

The People contend that Samaniego forfeited this contention by failing to request that the trial court clarify CALCRIM No. 400. We agree that this contention was forfeited, but nonetheless conclude that giving it did not result in prejudicial error.

### 3. Forfeiture

■ Generally, " '[a] party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' " (*People v. Hart* (1999) 20 Cal.4th 546, 622 [85 Cal.Rptr.2d 132, 976 P.2d 683]; see *People v. Guerra* (2006) 37 Cal.4th 1067, 1134 [40 Cal.Rptr.3d 118, 129 P.3d 321].) As discussed below, CALCRIM No. 400 is generally an accurate statement of law, though misleading in this case. Samaniego was therefore obligated to request modification or clarification and, having failed to have done so, forfeited this contention. Even if this contention had been preserved for appeal, we would nonetheless find that there was no prejudicial error.

### 4. Propriety of CALCRIM No. 400

*People v. McCoy* (2001) 25 Cal.4th 1111 [108 Cal.Rptr.2d 188, 24 P.3d 1210] (*McCoy*) articulates the controlling principles in resolving the question

of whether an aider and abettor of first degree murder is always equally as guilty as the direct perpetrator. In that case, McCoy and Lakey were convicted of first degree murder and two counts of attempted murder when each of them fired guns at a group of people while committing a driveby shooting. Two people in the group were shot, one fatally. McCoy fired the fatal shots. Someone from outside of the car returned fire wounding Lakey. At trial, McCoy, but not Lakey, testified. McCoy admitted shooting but claimed to have done so because he believed he would be shot. Earlier that day he had driven past the same location, and shots were fired at him. When he returned with Lakey, he saw a man in the group holding what appeared to be a gun. Believing the man was going to shoot him, McCoy fired his gun until it was empty. (*McCoy, supra,* at p. 1115.)

The Court of Appeal reversed McCoy's conviction for misinstruction on unreasonable self-defense. (*McCoy, supra,* 25 Cal.4th at p. 1115.) The California Supreme Court concluded that it was possible on retrial that McCoy could be found guilty of manslaughter and attempted manslaughter on an unreasonable self-defense theory, rather than of murder and attempted murder. It characterized the issue before it as whether reversal of McCoy's convictions also required reversal of Lakey's because Lakey, found guilty as an aider and abettor, could not be guilty of a greater offense than the perpetrator. (*Id.* at p. 1116.)

The Supreme Court reasoned that "when a person, with the mental state necessary for an aider and abettor, helps or induces another to kill, that person's guilt is determined by the combined acts of all the participants as well as that person's own *mens rea.* If that person's *mens rea* is more culpable than another's, that person's guilt may be greater even if the other might be deemed the actual perpetrator." (*McCoy, supra,* 25 Cal.4th at pp. 1117, 1122, italics added.) " '[O]nce it is proved that "the principal has caused an *actus reus,* the liability of each of the secondary parties should be assessed according to his own *mens rea.*" ' " (*Id.* at p. 1118.) When the offense is a specific intent offense, " 'the accomplice must "share the specific intent of the perpetrator"; this occurs when the accomplice "knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime." ' " (*Ibid.*) In the case of murder, the aider and abettor "must know and share the murderous intent of the actual perpetrator." (*Ibid.*)

Though *McCoy* concluded that an aider and abettor could be guilty of a greater offense than the direct perpetrator, its reasoning leads inexorably to the further conclusion that an aider and abettor's guilt may also be less than the perpetrator's, if the aider and abettor has a less culpable mental state. (See *People v. Woods* (1992) 8 Cal.App.4th 1570, 1577 [11 Cal.Rptr.2d 231].)

Consequently, CALCRIM No. 400's direction that "[a] person is *equally guilty* of the crime [of which the perpetrator is guilty] whether he or she committed it personally or aided and abetted the perpetrator who committed it" (CALCRIM No. 400, italics added), while generally correct in all but the most exceptional circumstances, is misleading here and should have been modified.

### 5. *Harmless error*

■ Though we find CALCRIM No. 400 to be misleading as applied to the unique circumstances presented here, we must still determine if the error was prejudicial. An instruction that omits or misdescribes an element of a charged offense violates the right to jury trial guaranteed by our federal Constitution, and the effect of this violation is measured against the harmless error test of *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824]. (*People v. Williams* (2001) 26 Cal.4th 779, 797 [111 Cal.Rptr.2d 114, 29 P.3d 197].) Under that test, an appellate court may find the error harmless only if it determines beyond a reasonable doubt that the jury verdict would have been the same absent the error. (*Neder v. United States* (1999) 527 U.S. 1, 15 [144 L.Ed.2d 35, 119 S.Ct. 1827].) CALCRIM No. 400 misdescribes the prosecution's burden in proving the aider and abettor's guilt of first degree murder by eliminating its need to prove the aider and abettor's (1) intent, (2) willfulness, (3) premeditation and (4) deliberation, the mental states for murder. The error here is harmless beyond a reasonable doubt because the jury necessarily resolved these issues against appellants under other instructions. (See *People v. Stewart* (1976) 16 Cal.3d 133, 141 [127 Cal.Rptr. 117, 544 P.2d 1317] [factual question posed by omitted instruction was necessarily resolved adversely to appellant under the properly given instruction].)

The jury necessarily found that appellants acted willfully with intent to kill. It was instructed regarding the multiple-murder special circumstance in accordance with CALCRIM No. 702 as follows: "If the defendant was not the actual killer then the People have the burden of proving beyond a reasonable doubt that he acted with the *intent to kill* for the special circumstance of multiple murder convictions to be true. If the People have not met this burden, you must find this special circumstance has not been proved true for this defendant." (Italics added.) The jury found the special circumstance to be true, thereby necessarily finding that each appellant had the specific intent to kill. The jury was also instructed that appellants acted willfully if they intended to kill. (CALCRIM No. 521.) Hence, the jury also found that appellants acted willfully.

The jury also necessarily found that appellants acted deliberately and with premeditation. It could have found appellants guilty only as aiders and

abettors, as the shooter was unknown. It received aiding and abetting instructions, including CALCRIM No. 401, which stated that to prove guilt as an aider and abettor the prosecution was required to prove "1. The perpetrator committed the crime; 2. The defendant knew that the perpetrator intended to commit the crime; 3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; AND 4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime."

█ It would be virtually impossible for a person to know of another's intent to murder and decide to aid in accomplishing the crime without at least a brief period of deliberation and premeditation, which is all that is required. (*People v. Hughes* (2002) 27 Cal.4th 287, 371 [116 Cal.Rptr.2d 401, 39 P.3d 432] [" ' " 'Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . .' . . . " ' "].) In the context of attempted murder, *People v. Lee* (2003) 31 Cal.4th 613 [3 Cal.Rptr.3d 402, 74 P.3d 176], supports this conclusion. It stated: "[T]o be guilty of attempted murder as an aider and abettor, a person must give aid or encouragement with knowledge of the direct perpetrator's intent to kill and with the purpose of facilitating the direct perpetrator's accomplishment of the intended killing—which means that the person guilty of attempted murder as an aider and abettor must intend to kill. [Citation.] [¶] . . . Where, as in the present case, the natural-and-probable-consequences doctrine does not apply, such an attempted murderer necessarily acts willfully, that is with intent to kill. *In addition, he or she also necessarily acts with a mental state at least approaching deliberation and premeditation—concepts that entail ' " 'careful thought and weighing of considerations' " ' and ' " 'preexisting reflection' " ' [citation], as opposed to 'mere unconsidered or rash impulse hastily executed' [citation]—because he or she necessarily acts with knowledge of the direct perpetrator's intent to kill and with a purpose of facilitating the direct perpetrator's accomplishment of the intended killing.*" (*Id.* at p. 624, italics added.)

### B. *CALCRIM No. 1403*

#### 1. *Background*

The information alleged a gang enhancement within the meaning of section 186.22. The trial court instructed the jury on the uses of gang evidence in accordance with CALCRIM No. 1403, as follows: "You may consider evidence of gang activity only for the limited purpose of deciding whether: [¶] The defendant acted with the intent, purpose, and knowledge that are required to prove the gang-related enhancements charged; OR [¶] The defendant had a motive to commit the crime charged. [¶] You may also

consider this evidence when you evaluate the credibility or believability of a witness and when you consider the facts and information relied on by an expert witness in reaching his or her opinion. [¶] You may not consider this evidence for any other purpose. You may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime." No objection or request for modification or clarification of this instruction was made.

### 2. Contention

Samaniego contends that instructing the jury in accordance with CALCRIM No. 1403 was erroneous. He argues that it was improper to allow the jury to consider gang expert testimony as to motive and witness credibility, the optional clauses of CALCRIM No. 1403, and that such evidence should have been limited to proof of the gang enhancement. He further contends that he received ineffective assistance of counsel in violation of the Sixth Amendment when his attorney acceded to the proposed instruction without objection and failed to assert any Evidence Code section 352 objections to the gang evidence.

### 3. Propriety of CALCRIM No. 1403

██ California courts have long recognized the potential prejudicial effect of gang evidence. As a result, our Supreme Court has condemned the introduction of such evidence "if only tangentially relevant, given its highly inflammatory impact." (*People v. Cox* (1991) 53 Cal.3d 618, 660 [280 Cal.Rptr. 692, 809 P.2d 351], disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22 [87 Cal.Rptr.3d 209, 198 P.3d 11].) Because gang evidence creates a risk that the jury will infer that the defendant has a criminal disposition and is therefore guilty of the charged offense, "trial courts should carefully scrutinize such evidence before admitting it." (*People v. Williams* (1997) 16 Cal.4th 153, 193 [66 Cal.Rptr.2d 123, 940 P.2d 710].)

Nonetheless, evidence related to gang membership is not insulated from the general rule that all relevant evidence is admissible if it is relevant to a material issue in the case other than character, is not more prejudicial than probative, and is not cumulative. (*People v. Avitia* (2005) 127 Cal.App.4th 185, 192 [24 Cal.Rptr.3d 887]; see also *People v. Hernandez* (2004) 33 Cal.4th 1040, 1049 [16 Cal.Rptr.3d 880, 94 P.3d 1080]; Evid. Code, §§ 210, 351.)

Gang evidence is relevant and admissible when the very reason for the underlying crime, that is the motive, is gang related. (See, e.g., *People v. Frausto* (1982) 135 Cal.App.3d 129, 140 [185 Cal.Rptr. 314] [motive].)

" '[B]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence.' [Citations.]" (*People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1550 [25 Cal.Rptr.3d 124]; see also *People v. Garcia* (2008) 168 Cal.App.4th 261, 275 [85 Cal.Rptr.3d 393]; *People v. Martinez* (2003) 113 Cal.App.4th 400, 413 [7 Cal.Rptr.3d 49]; *People v. Zepeda* (2008) 167 Cal.App.4th 25, 35 [83 Cal.Rptr.3d 793].) Gang evidence is also relevant on the issue of a witness's credibility. (See *People v. Ayala* (2000) 23 Cal.4th 225, 277 [96 Cal.Rptr.2d 682, 1 P.3d 3]; *People v. Sanchez* (1997) 58 Cal.App.4th 1435, 1450 [69 Cal.Rptr.2d 16].)

CALCRIM No. 1403, as given here, is neither contrary to law nor misleading. It states in no uncertain terms that gang evidence is not admissible to show that the defendant is a bad person or has a criminal propensity. It allows such evidence to be considered only on the issues germane to the gang enhancement, the motive for the crime and the credibility of witnesses. Samaniego concedes that the instruction was proper regarding the gang enhancement, but contests its propriety here with regard to motive and credibility. He argues that those subjects of the instruction are clearly optional, do not apply unless the evidence unique to the case supports them, and there was no such evidence here. He is wrong.

Including the motive and credibility optional paragraphs of CALCRIM No. 1403 in the instruction was amply supported by the evidence. Gang evidence was essential to establishing the motive for these senseless murders and tying appellants, gang members, to them. In regard to the Nelson murder, Green and the tweakers were disrespecting the Toonerville gang by spreading rumors that Huero, a Toonerville gang member, was a police informant. The People's gang expert explained the central importance of respect in gang culture and how these rumors were a sufficient motive for retaliation. Gang members were unhappy with the tweakers for spreading these rumors. Sawyer warned Green to stay away from them. Huero was menacing to Kidd. On the day of the murder, at the Glory Avenue residence, Perdomo aggressively demanded the paperwork from Green and later, at Huero's apartment, Samaniego questioned Kidd extensively about it. Appellants and Pena then conferred, had Harvey immediately drive them to the tweaker house, asked for Green and, when he was not there, shot Nelson, a tweaker, who had left the tweaker house minutes before. The People's gang expert explained that shooting Nelson sent a message to the tweakers not to disrespect the gang and its members.

With regard to the Palada murder, appellants went to his apartment to demand that he pay rent for selling drugs in Toonerville gang territory. When he refused, he was killed. The gang expert explained that the primary source

of gang income is its narcotics activities, which in turn depend on its control over narcotics sales in its territory. Those selling drugs within gang territory interfere with gang business and must therefore pay tax. Gang evidence was critical to explaining, not appellants' general disposition to kill, but the specific motives for killing Nelson and Palada.

The evidence here also supported instructing the jury that it could consider gang evidence on the issue of witness credibility. At trial, several witnesses testified differently than at the preliminary hearing or in prior statements given to police. Green was a reluctant witness with a faulty memory. He had received a call from Sawyer a few months before trial "asking" for his help. Green told the prosecutor before trial that a person coming to court about a matter in which he was not involved was "cruisin' for a bruisin'." At trial, he claimed not to recognize the paperwork, denied possessing it, speaking to Sawyer about it or being warned by Sawyer that Toonerville gang members were angry that he was spreading rumors. Kidd's trial testimony changed from what he had told detectives and testified to at the preliminary hearing, at which he testified that he could not identify any of the people who entered the van after the shots were fired at tweaker house. At trial, he testified that he saw Samaniego and Perdomo. Herrera also testified more favorably for the prosecution at trial than during his prior statements. He had told officers he could not identify the third person present at Palada's shooting, but testified at trial that it was Samaniego. Similarly, Harvey had given a less favorable story to police than she testified to at trial. She completely failed to tell detectives about the Nelson murder. At trial, she testified to her involvement in both murders. The disparities in the witnesses' testimony justified use of gang evidence to provide a plausible explanation for them.

Samaniego argues that credibility was not an issue because Herrera's, Kidd's and Harvey's testimony "did not fit the pattern [where] a witness's out of court statements are the most incriminating." But the question is not whether testimony fits a purported pattern, but whether credibility was an issue. The defense sought to impeach the People's witnesses with the contradictions between their trial testimony and their less favorable, prior out-of-court statements. Gang evidence was relevant to provide an explanation for the less favorable, prior statements.

Hence, there was ample evidence supporting inclusion of the optional motive and witness credibility paragraphs in CALCRIM No. 1403. Further, because gang evidence was central to this case involving gang members committing gang murders for gang motives, broad admissibility of gang evidence was appropriate and made it doubtful that most Evidence Code section 352 objections would have been sustained.

### 4. *Ineffective assistance of counsel*

■ To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that counsel's representation fell below an objective standard of reasonableness, and, but for counsel's errors, there is a reasonable probability that the result of the proceeding would have been different. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674, 104 S.Ct. 2052]; *People v. Berryman* (1993) 6 Cal.4th 1048, 1081 [25 Cal.Rptr.2d 867, 864 P.2d 40], overruled on other grounds in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1 [72 Cal.Rptr.2d 656, 952 P.2d 673].) A reasonable probability " 'is a probability sufficient to undermine confidence in the outcome.' " (*People v. Adkins* (2002) 103 Cal.App.4th 942, 950 [127 Cal.Rptr.2d 236].)

Samaniego has not established that his counsel's failure to object to CALCRIM No. 1403 or to make Evidence Code section 352 objections to gang evidence constituted ineffective assistance. As discussed above, CALCRIM No. 1403 correctly states the law and the evidence justified inclusion of the optional motive and witness credibility paragraphs. Because there was no error in giving the CALCRIM No. 1403 instruction in the form given, any objection to it would have been overruled. There is therefore no reasonable probability that an objection would have led to a different result. Further, given the breadth and centrality of the gang issues in this matter, it is doubtful that many Evidence Code section 352 objections would have been sustained. Failure to make meritless objections cannot be the basis of an ineffective assistance of counsel claim. (See *People v. Thomas* (1992) 2 Cal.4th 489, 531 [7 Cal.Rptr.2d 199, 828 P.2d 101].)

### C. *CALCRIM No. 224*

The jury was instructed on how to consider circumstantial evidence in accordance with CALCRIM No. 224.[10] Perdomo contends that the trial court erred in instructing the jury with CALCRIM No. 224, rather than CALCRIM

---

[10] CALCRIM No. 224, as given, states: "Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt. [¶] Also, before you may rely on circumstantial evidence to find the defendant guilty, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant is guilty. If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions points to innocence and another to guilt, you must accept the one that points to innocence. However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable."

No. 225.[11] He argues that CALCRIM No. 225 is to be used in lieu of the more general CALCRIM No. 224 when the only element substantially proved by circumstantial evidence is intent or mental state. Here, "the only element of the offense and the enhancements that rested substantially on circumstantial evidence was that of specific intent or mental state." This contention is without merit.

██ The trial court is required to instruct the jury on the general principles of law relevant to the issues raised by the evidence. (*People v. Breverman* (1998) 19 Cal.4th 142, 154 [77 Cal.Rptr.2d 870, 960 P.2d 1094].) CALCRIM No. 224 states such a principle that must be given sua sponte on those occasions when it is applicable. (*People v. Wiley* (1976) 18 Cal.3d 162, 174 [133 Cal.Rptr. 135, 554 P.2d 881]; *People v. Yrigoyen* (1955) 45 Cal.2d 46, 49 [286 P.2d 1].)[12] It is applicable only when the prosecution substantially relies on circumstantial evidence to establish any element of the case. (*People v. Yrigoyen, supra,* at p. 49; Bench Notes to CALCRIM No. 224.) The instruction should not be given where circumstantial evidence is incidental to and corroborative of direct evidence. (*People v. Malbrough* (1961) 55 Cal.2d 249, 250–251 [10 Cal.Rptr. 632, 359 P.2d 30]; see also *People v. Anderson* (2001) 25 Cal.4th 543, 582 [106 Cal.Rptr.2d 575, 22 P.3d 347].)

CALCRIM No. 225 is to be used in place of CALCRIM No. 224 "when the defendant's specific intent or mental state is the only element of the offense that rests substantially or entirely on circumstantial evidence."

---

[11] CALCRIM No. 225, provides: "The People must prove not only that the defendant did the acts charged, but also that (he/she) acted with a particular (intent/ [and/or] mental state). The instruction for (the/each) crime [and allegation] explains the (intent/ [and/or] mental state) required. [¶] A[n] (intent/ [and/or] mental state) may be proved by circumstantial evidence. [¶] Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt. [¶] Also, before you may rely on circumstantial evidence to conclude that the defendant had the required (intent/ [and/or] mental state), you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant had the required (intent/ [and/or] mental state). If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions supports a finding that the defendant did have the required (intent/ [and/or] mental state) and another reasonable conclusion supports a finding that the defendant did not, you must conclude that the required (intent/ [and/or] mental state) was not proved by the circumstantial evidence. However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable."

[12] CALCRIM Nos. 224 and 225 are substantially the same as their predecessors, CALJIC Nos. 2.01 and 2.02. In each pair, the lower numbered instruction informs the jury as to how to consider circumstantial evidence to find the defendant guilty, and the higher numbered instruction informs the jury on how to consider circumstantial evidence when only the element of mental state or intent has been proven by such evidence. Authorities discussing these CALJIC instructions are therefore instructive with regard to the analogous CALCRIM instructions.

(*People v. Honig* (1996) 48 Cal.App.4th 289, 341 [55 Cal.Rptr.2d 555] [discussing CALJIC No. 2.02]; see Bench Notes to CALCRIM Nos. 224 & 225.) CALCRIM Nos. 224 and 225 provide essentially the same information on how the jury should consider circumstantial evidence, but CALCRIM No. 224 is more inclusive. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1142 [36 Cal.Rptr.2d 235, 885 P.2d 1].)

In order to prove that a defendant is guilty of first degree murder, the prosecution must prove that the defendant willfully, deliberately and with premeditation, unlawfully killed a human being with malice aforethought. (See *People v. Garcia* (2008) 162 Cal.App.4th 18, 26, fn. 2 [74 Cal.Rptr.3d 912].) Here, the People's entire case was founded on circumstantial evidence, albeit exceptionally strong circumstantial evidence. There were no eyewitnesses to the actual shootings of Nelson or Palada. Evidence that appellants were the perpetrators was based upon their identification at the crime scenes near the time of the shootings, their motives and intentions as gang members, and their conduct both before and after the shootings. Thus, the trial court correctly instructed the jury with CALCRIM No. 224 instead of the narrower CALCRIM No. 225.

In any event, any error in instructing in accordance with CALCRIM No. 224 was harmless by even the most stringent beyond a reasonable doubt standard articulated in *Chapman v. California, supra*, 386 U.S. at page 24. "Because the trial court delivered the more inclusive instruction under [CALCRIM No. 224], its refusal to additionally instruct with [CALCRIM No. 225] clearly was not prejudicial error." (*People v. Rodrigues, supra*, 8 Cal.4th at p. 1142.) CALCRIM No. 224 told the jury how to evaluate circumstantial evidence with regard to motive and intent, as well as the other elements of the crime.

## II. Exclusion of Third Party Culpability Evidence

### A. Background

Herrera testified that Palada was threatened by a crossbow and another weapon earlier on the day of his murder. Later in the trial, when Palada's girlfriend, Alvaran, was testifying, she was asked if Palada had an acquaintance named Shane. The prosecutor objected on relevance grounds, and the trial court conducted a sidebar, at which Sawyer's attorney made an offer of proof that earlier on the day of Palada's murder Shane fired a crossbow at Palada and that it could, therefore, have been Shane who shot him. The trial court stated that there must be direct or circumstantial evidence linking Shane to the actual perpetration of the crime. Before ruling, it wanted to determine if Alvaran heard Shane's voice outside at the time of the shooting. It therefore conducted an Evidence Code section 402 hearing.

At the hearing, Alvaran testified that she was at Palada's apartment on the day of his murder and heard Shane argue with Palada about the price of drugs Shane was selling to him. Thirty minutes later, Alvaran saw them arguing on the sidewalk in front of the building but could not hear their conversation. Shane had a knife, which he held with the blade pointed at Palada, who was unarmed. Alvaran did not see Shane fire a crossbow at Palada. Shane was angry when he left. Palada was murdered more than two to three hours later. The voices Alvaran heard immediately before the shooting were not the same as Shane's voice, although she could not identify his voice as she had only met him twice. He spoke like a gangster, as did the people speaking with Palada just before the shooting.

At the conclusion of the hearing, the prosecutor argued that there was no connection between Shane and the shooting and that the circumstances immediately before the shooting were inconsistent with the conflict between Shane and Palada. Samaniego's counsel argued that Alvaran heard Shane make a demand for payment similar to what she heard before the shooting. It was plausible that Shane was angry over Palada's refusal to pay for drugs and returned a few hours later with a gun. Shane's voice and the voices outside before the shooting all sounded like gangsters.

The trial court's tentative ruling was to exclude the evidence, but it invited the parties to further research the issue and to provide additional argument. The next day, the issue was revisited. The prosecutor argued that the third party evidence had to be evaluated in light of the evidence already presented and to be presented, including Harvey's incriminating testimony. The trial court agreed it should consider the strength of the prosecution's evidence. Defense counsel argued that the decision should be based solely upon the strength of the third party culpability evidence. The trial court concluded that the evidence did not link Shane to the shooting, as there was no evidence he was present at the time of the shooting, his voice was not recognized, and a gun, not a knife, was used. Further, the evidence was contrary to the very substantial evidence by Herrera and Harvey identifying appellants as being present.

### B. *Contention*

Samaniego and Perdomo contend that the trial court abused its discretion by excluding third party culpability evidence on the ground that the prosecution's case against them was strong, thereby depriving them of their constitutional rights to present a defense and to a jury trial on a contested factual issue. They argue that determining the admissibility of such evidence by considering the strength of the prosecution's case calls for the trial court to make credibility evaluations that properly belong to the jury. This contention is without merit.

## C. *Third party culpability evidence*

■ All relevant evidence is admissible. (Evid. Code, § 351.) Relevant evidence is all evidence "including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) In determining whether evidence has a tendency to prove a material fact, it must be determined whether it " ' "logically, naturally, and by reasonable inference" ' " establishes the fact. (*People v. Thompson* (1980) 27 Cal.3d 303, 316 [165 Cal.Rptr. 289, 611 P.2d 883], overruled on other grounds in *People v. Rowland* (1992) 4 Cal.4th 238, 260 [14 Cal.Rptr.2d 377, 841 P.2d 897].) A trial court has wide discretion in determining the relevance of evidence. (*People v. Warner* (1969) 270 Cal.App.2d 900, 908 [76 Cal.Rptr. 160].) We review the admission and exclusion of evidence on relevance grounds for abuse of that discretion. (*People v. Cole* (2004) 33 Cal.4th 1158, 1198 [17 Cal.Rptr.3d 532, 95 P.3d 811]; *People v. Kipp* (2001) 26 Cal.4th 1100, 1123 [113 Cal.Rptr.2d 27, 33 P.3d 450] [relevance objection].)

■ Third party culpability evidence is treated like all other evidence; if relevant it is admissible. (*People v. Alcala* (1992) 4 Cal.4th 742, 792 [15 Cal.Rptr.2d 432, 842 P.2d 1192] (*Alcala*).) It is admissible if it is " 'capable of raising a reasonable doubt of defendant's guilt. At the same time, we do not require that any evidence, however remote, must be admitted to show a third party's possible culpability. . . . [E]vidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime.' " (*People v. Page* (2008) 44 Cal.4th 1, 38 [79 Cal.Rptr.3d 4, 186 P.3d 395].) To introduce third party culpability evidence, a defendant must show that the evidence is relevant and that its probative value is not " 'substantially outweighed by the risk of undue delay, prejudice, or confusion.' " (*Alcala, supra,* at p. 792.)

The crux of Samaniego and Perdomo's contention is twofold: First they argue that the trial court erred in considering the strength of the prosecution's case in deciding whether to admit the third party culpability evidence; and second they argue that there was ample evidence connecting Shane to the murder so as to require admission of the evidence. We begin our analysis by discussing the first issue.

On the one hand, admission of third party culpability evidence is based upon its relevance and weight as against its capacity to confuse, delay or prejudice, as set forth in Evidence Code section 352. This mitigates against

considering the strength of the prosecution's case in deciding the admissibility of third party culpability evidence as it focuses on the evidence to be admitted. However, on the other hand, as a practical matter, it is unclear how one can assess whether third party culpability evidence can raise a reasonable doubt and the potential for prejudice, delay and confusion without considering the strength of the prosecution's case. It would seem that it would require stronger third party culpability evidence to raise a doubt to an overwhelming prosecution case than to a weak one. Also, the assessment of the capacity of the third party culpability evidence to confuse or delay would be similarly affected by the strength of the prosecution case.

In any event, we need not decide this difficult question. The trial court read the applicable legal principles for admitting third party culpability evidence, following which it concluded that there was no evidence linking Shane to Palada's murder. It emphasized that Alvaran did not identify Shane as being at the scene of the shooting, and concluded: "This proffered evidence is nothing more than a red herring. It's a diversion. It doesn't have probative value. *But even if there was some relevancy*, the court concludes that its probative value is substantially outweighed by the probability that its admission will necessitate undue consumption of time and create substantial danger of undue prejudice, of confusing the issues, and misleading the jury." (Italics added.) Thus, the trial court focused its ruling on the dearth of evidence linking Shane to the crime, suggesting that weighing the strength of the People's evidence simply supported this conclusion.

We next consider the second issue posed by Samaniego; whether there was sufficient evidence connecting Shane to Palada's murder. The trial court did not abuse its discretion in concluding that there was not. Shane held a knife, not a gun, directed toward Palada and argued with him over the price of drugs hours before the shooting. There was no evidence that Shane was present at the scene of the shooting, when the shooting occurred. Herrera, who identified appellants as the perpetrators, did not testify that anyone else was present. Alvaran could not identify him as one of the voices she heard outside. That conversation pertained to taxing Palada for selling drugs in Toonerville gang territory. The dispute between Shane and Palada related to the price of drugs Shane was going to sell to Palada. There was no evidence that Shane was a Toonerville gang member and hence that he had any interest in taxing Palada. While evidence that Shane argued with and was angry at Palada provided him a motive to kill Palada, and contacts with Palada provided him the opportunity, there was no evidence that Shane was in any fashion involved in his murder. Moreover, if Shane wanted to kill Palada, there is no explanation of why he could not have done so when he held the unarmed Palada at knifepoint.

Appellants rely on the United States Supreme Court case of *Holmes v. South Carolina* (2006) 547 U.S. 319 [164 L.Ed.2d 503, 126 S.Ct. 1727] (*Holmes*) which held that an evidentiary rule that a criminal defendant could not prove third party culpability if the prosecution introduced forensic evidence that strongly supported a guilty verdict violated the defendant's federal constitutional rights to a fair trial and to present a defense. The Court was concerned that "by evaluating the strength of only one party's evidence, no logical conclusion can be reached regarding the strength of contrary evidence offered by the other side to rebut or cast doubt." (*Id.* at p. 331.) We do not find *Holmes* controlling here. It dealt with a judicially created rule precluding third party culpability evidence if the prosecution presented strong evidence, especially forensic evidence. It thereby focused the inquiry on the strength of the prosecution's case, not the probative value or potential adverse effects of the third party culpability evidence. *Holmes* did not consider the extent to which a trial court might consider the strength of the prosecution's evidence in exercising its discretion to determine whether the third party evidence could raise a reasonable doubt as to the defendant's guilt. In the matter before us, the trial court's focus was on the lack of connection between Shane and the crime, not on the strength of the People's case. *Holmes* is also distinguishable on its facts, as the third party in that case was strongly linked to the crime by having told numerous people that the charged defendant was innocent and that the third party himself committed the crime. No such compelling evidence is present here.

### III. *Uncorroborated Accomplice Testimony*

#### A. *Background*

Section 1111 provides that accomplice testimony must be corroborated.[13] The trial court instructed the jury that if the crimes of murder were committed, Harvey was an accomplice as a matter of law. (CALCRIM No. 335.) No objection was made to that instruction.

#### B. *Contentions*

Samaniego contends that his conviction of the Palada murder must be reversed because it rests exclusively on the uncorroborated testimony of

---

[13] Section 1111 provides: "A conviction [cannot] be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. [¶] An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given."

Harvey, an accomplice, the only person who identified him as involved in the murder. Herrera only guessed that he was involved. This contention lacks merit.

## C. *We assume Harvey was an accomplice*

The Attorney General contends that Harvey was not an accomplice within the meaning of section 1111. This contention raises several issues including (1) whether the People forfeited this contention by failing to object to the trial court's instruction that Harvey was an accomplice as a matter of law, (2) whether the trial court erred in so concluding, and (3) whether defendant met its burden of establishing that Harvey was an accomplice. While we seriously doubt that the evidence supported an instruction that Harvey was an accomplice as a matter of law,[14] we need not resolve these questions, as we conclude that there was ample evidence corroborating her testimony.

## D. *There was sufficient corroboration*

A conviction based solely upon an accomplice's testimony cannot be sustained. (*People v. Verlinde* (2002) 100 Cal.App.4th 1146, 1157 [123 Cal.Rptr.2d 322]; *In re Mitchell P.* (1978) 22 Cal.3d 946, 949 [151 Cal.Rptr. 330, 587 P.2d 1144].) This requirement derives from the notion that evidence of an accomplice should be viewed with care, caution and suspicion because it comes from a tainted source and is often given in the hope or expectation of leniency or immunity. (*People v. Wallin* (1948) 32 Cal.2d 803, 808 [197 P.2d 734].)

The corroboration must, without aid from the accomplice's testimony, connect the defendant to the charged offense, but may be circumstantial, slight and entitled to little consideration when standing alone. (*People v. Davis* (2005) 36 Cal.4th 510, 543 [31 Cal.Rptr.3d 96, 115 P.3d 417]; *People v. Zapien* (1993) 4 Cal.4th 929, 982 [17 Cal.Rptr.2d 122, 846 P.2d 704].) Corroborating evidence need not be sufficient to establish the defendant's guilt or corroborate the accomplice to every fact to which the accomplice

---

[14] See *People v. Sully* (1991) 53 Cal.3d 1195, 1228 [283 Cal.Rptr. 144, 812 P.2d 163] (simply because a person is at the scene of an offense or transports defendant to the scene and later observes the victim being stabbed does not of itself constitute sufficient evidence that the person is an accomplice. Speculation that the person knew that a robbery would occur and would lead to death is too speculative); *People v. Lewis* (2001) 26 Cal.4th 334, 369 [110 Cal.Rptr.2d 272, 28 P.3d 34] (alleged accomplice at crime scene, possessing intimate knowledge of the crimes beyond that of a mere bystander, and other evidence implicating him in the crime too speculative and insubstantial to warrant an accomplice instruction); *People v. Snyder* (2003) 112 Cal.App.4th 1200, 1220 [5 Cal.Rptr.3d 711] (person who only provides assistance with knowledge of the perpetrator's criminal purpose, but without sharing the perpetrator's purpose and intent is liable only as an accessory, not as an accomplice).

testified. (*People v. Traub* (1959) 175 Cal.App.2d 709, 712 [346 P.2d 805]; *People v. Davis, supra,* at p. 543.) It must raise more than a suspicion or conjecture of guilt, and is sufficient if it connects the defendant with the crime in such a way as to reasonably satisfy the trier of fact as to the truthfulness of the accomplice. (*People v. Hooker* (1954) 126 Cal.App.2d 394, 401 [272 P.2d 839]; *People v. Davis, supra,* at p. 543.)

 The corroborating evidence here reasonably supports the truthfulness of Harvey's testimony. Appellants were all Toonerville gang members. They frequently associated with each other, often at the Glory Avenue residence. Less than a month before Palada's murder, there was evidence that the same three individuals, working together, went to the tweaker house and shot Nelson in retaliation for the tweakers' disrespect of the Toonerville gang. With regard to Palada's murder, the evidence indicated that it was motivated to benefit the gang by taxing Palada for selling drugs in gang territory. Gang membership can be a significant factor in corroborating an accomplice's testimony. (See *People v. Vu* (2006) 143 Cal.App.4th 1009, 1022 [49 Cal.Rptr.3d 765].) These facts established both a motive and opportunity for Samaniego to participate in Palada's murder. (See *People v. Szeto* (1981) 29 Cal.3d 20, 28 [171 Cal.Rptr. 652, 623 P.2d 213].) Herrera testified that he "believed" that Samaniego was the third person in front of Palada's apartment at the time Palada was murdered based upon the way he stood, his stature and his body form. In this context, we do not find, as appellant argues, that Herrera's use of the term "believe" was a mere guess. His testimony indicates that it was based upon his familiarity with Samaniego and his stature and form. He told one detective before trial that one of the three men there was Samaniego. While he also testified that he was not sure if Samaniego was the third person at Palada's apartment and had no idea who the third person was, rendering his corroboration slight, it, along with the other evidence discussed above was adequate to justify finding sufficient corroboration of Harvey's testimony to support the convictions.

## IV. *Exclusion of Evidence*

### A. *Gang expert evidence*

#### 1. *Background*

During the defense case, Sawyer sought to elicit a response from the defense gang expert to the question, "And have you formed an opinion whether every time a member goes along on a ride with somebody else— whether or not they always know what is going to happen before it happens?" The prosecutor objected that the question was speculative, irrelevant, an improper hypothetical, and hearsay. The trial court sustained the objection on

the ground that the question was speculative as to what is on the mind of gang members when they accompany other members.

A sidebar discussion ensued. Defense counsel argued that all experts rely on "some hearsay." The trial court stated that the problem with the requested opinion was that it called for speculation as to what was in the mind of gang members when they go out with other gang members. The court stated that the question called for the kind of opinion "outlawed by the *Killebrew* decision."[15] "[A] gang expert is not entitled to testify what's in the mind, even if it's an opinion, of other gang members." The trial court sustained the objection.

### 2. *Contention*

Sawyer contends that the trial court erred in refusing to admit expert testimony that gang members can be in the company of other gang members without knowing that another member is going to commit a crime and/or without the intent to assist in the crime.

### 3. *Admissibility*

The Court of Appeal in *Killebrew* held that a police gang expert cannot testify as to the subjective knowledge and intent of a gang member to possess a handgun. (*Killebrew, supra*, 103 Cal.App.4th at p. 647; see also *People v. Gonzalez* (2006) 38 Cal.4th 932, 946 [44 Cal.Rptr.3d 237, 135 P.3d 649].) There, the prohibited question pertained to the intent of the defendant, not to a hypothetical gang member. The question here did not request specific information regarding the knowledge or intent of appellants as they rode in the vehicles to commit the charged murders. It requested an opinion as to whether in gang culture and operation every time a gang member rides with other gang members he or she is aware of what will happen. Hence, the question was not within the *Killebrew* reasoning. Consequently, the trial court erred in finding the question speculative. It was no more speculative than gang expert opinion that gang members retaliate against someone who disrespects the gang. While that opinion may generally be true regarding gang culture, it is still speculative in its application to the specific conduct of gang members in a particular case.

We also conclude, however, that the error was harmless under the *Watson*[16] standard in that it is not reasonably probable that had the evidence been admitted a result more favorable to appellants would have ensued. (*People v.*

---

[15] *People v. Killebrew* (2002) 103 Cal.App.4th 644 [126 Cal.Rptr.2d 876] (*Killebrew*).
[16] *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].

*Lawson* (2005) 131 Cal.App.4th 1242, 1249, fn. 7 [32 Cal.Rptr.3d 634] ["the erroneous exclusion of evidence is ordinarily reviewed for harmless error under *Watson*"].) We begin with the fact that Perdomo showed no hesitancy to display a gun to Kidd and Green on the day of Nelson's murder. It is likely inferable that he displayed it to his associates, suggesting to them what was going to happen at the tweaker house. Also, this contention pertains to a single question, of minimal, if any, relevance, made during the course of a very lengthy trial. Had it been answered, it is unlikely to have made a significant impact. The challenged question was so broad as to be meaningless. It asked whether Alonso had formed an opinion as to whether *"every time"* a gang member rode with another gang member the gang member knew what was going to happen. As thus stated, the anticipated negative answer would have come as little surprise to any juror, who would likely have formed the same conclusion without the aid of the expert's response. Moreover, it was vague as to what it meant by "what [was] going to happen." Finally, the evidence is strong that appellants each knew what was going to transpire with regard to each murder. They were all gang members and associated regularly with each other. Sawyer and Perdomo frequently shared the Glory Avenue residence, as well as sharing Harvey as a girlfriend/sexual partner.

Before the Nelson murder, appellants were all aware of and angry about the rumors being spread by the tweakers, and, given gang culture, were going to the tweaker house to send the tweakers a strong message. Green had been warned by Sawyer to stay away from Toonerville gang members and not mention the paperwork because they were not happy. Huero showed displeasure by acting aggressively toward Kidd and gesturing as if he had a gun, when Green and Kidd tried to purchase marijuana from him. Samaniego and Perdomo both aggressively questioned Green and Kidd about the paperwork and went to the tweaker house shortly thereafter.

With respect to the Palada murder, appellants went to his apartment specifically to collect rent from him because he was selling drugs in gang territory. This was less than a month after Nelson's murder, so appellants had acted to kill together before. The gang expert testified about the importance to gangs of controlling drug sales in their territories and taking strong action against interlopers.

These facts provide a strong inference that appellants each knew what would happen when they went to the locations where the charged murders took place.

B. *Evidence that Sawyer did not speak Spanish*

1. *Background*

The evidence established that there were three people at the scene of the Palada murder. Before the shooting, one of them yelled, "Tirale, tirale," Spanish for "Shoot, shoot." Immediately thereafter, the shooting occurred.

The prosecutor moved to exclude Harvey's testimony that Sawyer could not speak or understand Spanish on the grounds that such testimony was irrelevant, speculative and hearsay.[17] Sawyer's counsel argued that if Sawyer did not speak Spanish, he could not understand the word "tirale." He made an offer of proof that Harvey would testify that she never heard him speak Spanish. The trial court indicated its tentative conclusion that the evidence constituted hearsay, speculation and improper opinion, but deferred ruling because it wanted to first "hear what her direct testimony is," and would later revisit the point. Defense counsel failed to raise the point again or to attempt to present the evidence.

2. *Contentions*

Sawyer contends that the trial court erred in excluding evidence that he did not speak Spanish, mandating reversal of his conviction of the Palada murder. He argues that such evidence "would have strongly supported the inference that appellant was not the individual who orally encouraged the shooting, he was not the person being spoken to in Spanish and being encouraged to shoot, and he would not have understood and responded to such encourage-ment in Spanish by committing the shooting."

The People contend that appellant forfeited this contention. The People argue that the trial court deferred ruling on its motion to exclude the evidence and none of appellants ever raised the issue again. We agree. To the extent that Sawyer failed to request a final ruling on the issue, as well as again tried to introduce the challenged evidence, the claim was forfeited. (*Jones v. P.S. Development Co., Inc.* (2008) 166 Cal.App.4th 707, 711, fn. 4 [82 Cal.Rptr.3d 882]; *People v. Far West Ins. Co.* (2001) 93 Cal.App.4th 791, 798, fn. 3 [113 Cal.Rptr.2d 448].)

3. *Irrelevance*

Even if Sawyer had not forfeited his claim, we would reject it on the merits. As set forth in part II.C., *ante*, all evidence that logically has a

---

[17] Herrera had already testified that he never heard Sawyer speak Spanish.

tendency to prove a material fact is relevant. (Evid. Code, § 351.) The trial court has broad discretion to make that determination (*People v. Warner,* *supra,* 270 Cal.App.2d at p. 908) which we review for abuse. (*People v. Kipp,* *supra,* 26 Cal.4th at p. 1123.) It would not have been an abuse of discretion had the trial court ruled that Harvey's testimony was inadmissible.

First, simply because Harvey in her association with Sawyer never heard him speak Spanish, does not mean that he did not. Second, even if he did not speak or understand Spanish, he might still have understood the meaning of the word "tirale." Many non-Spanish-speaking people are familiar with common Spanish words. While "tirale" might not ordinarily be a common Spanish word, Sawyer was a member of an Hispanic criminal street gang involved in violent crime. In that context, the word "tirale" might be commonly used by the gang and known even to a non-Spanish-speaking gang member. Third, even if Sawyer did not know the meaning of the word, in the context presented at Palada's home, its meaning might have been evident to him. Fourth, the gang members might have discussed that Perdomo would yell when he wanted Palada shot. Additionally, there was already evidence before the jury presented by Herrera that he never heard Sawyer speak Spanish. Finally, there is little evidence that Sawyer was the person who fired the gun. If he did not, he would have had no need to understand the command. His role in the shooting may not have involved the actual firing.

For the foregoing reasons, if the evidence was improperly excluded, the error was harmless. It was not reasonably probable that its admission would have altered the verdicts. (*People v. Lawson, supra,* 131 Cal.App.4th at p. 1249, fn. 7 [erroneous exclusion of evidence is ordinarily reviewed for harmless error under *Watson*[18] standard].)

### 4. *Ineffective assistance of counsel*

Finally, Sawyer argues that if this claim was waived by his counsel's failure to request a ruling on it, then Sawyer suffered ineffective assistance of counsel. We disagree. As set forth in part I.B.4., *ante,* to prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that but for counsel's errors, there is a reasonable probability that the result of the proceeding would have been different. (*People v. Berryman, supra,* 6 Cal.4th at p. 1081.) Because we have concluded that the trial court did not err in excluding evidence that Sawyer did not speak Spanish, there is no reasonable probability that had his attorney sought and obtained a ruling on the admissibility of that evidence, it would have affected the outcome.

---

[18] *People v. Watson, supra,* 46 Cal.2d at page 836.

## V. *Correction of Abstract of Judgment*

The trial court imposed direct victim restitution pursuant to section 1202.4, subdivision (f) in the amount of $10,501.57.[19] The court orally ordered the restitution to be payable jointly and severally among all three appellants. The abstract of judgment of each of the three appellants reflects the restitution award, without reflecting that the obligation is joint and several.

Sawyer contends that the abstract of judgment must be corrected to reflect the trial court's oral pronouncement of judgment that the victim restitution is imposed jointly and severally upon all three appellants. The People agree as do we.

Generally, a judgment is "the final determination of the rights of the parties in an action or proceeding." (Code Civ. Proc., § 577.) Rendition of judgment is an oral pronouncement. (*People v. Mesa* (1975) 14 Cal.3d 466, 471 [121 Cal.Rptr. 473, 535 P.2d 337].) The abstract of judgment is not the judgment of conviction. (*Ibid.*) The court's oral pronouncement controls over the abstract of judgment as the latter cannot add to or modify the judgment which it purports to summarize. (*Ibid.*; *People v. Farell* (2002) 28 Cal.4th 381, 384, fn. 2 [121 Cal.Rptr.2d 603, 48 P.3d 1155].) We can order the trial court to correct the abstract of judgment. (See *People v. Mitchell* (2001) 26 Cal.4th 181, 183 [109 Cal.Rptr.2d 303, 26 P.3d 1040]; *People v. Martinez* (1998) 65 Cal.App.4th 1511, 1523 [77 Cal.Rptr.2d 492].) Hence, appellants' abstracts of judgment must be corrected to reflect that the obligation for victim restitution is joint and several.

## VI. *Parole Revocation Fine*

The trial court imposed on each appellant a $5,000 parole revocation fine pursuant to section 1202.45. Sawyer contends that that fine was improperly assessed and must be stricken because he was sentenced to life without the possibility of parole. He argues that it may not be imposed where there is no possibility of parole. The People agree. We do too.

Section 1202.45 provides: "In every case where a person is convicted of a crime and whose sentence includes a period of parole, the court shall at the time of imposing the restitution fine pursuant to subdivision (b) of Section 1202.4, assess an additional parole revocation restitution fine in the same amount as that imposed pursuant to subdivision (b) of Section 1202.4. This additional parole revocation restitution fine . . . shall be suspended unless the

---

[19] Sawyer states that the victim restitution is $10,534.36, which conflicts with the court's ordered victim restitution and the abstracts of judgment.

person's parole is revoked. Parole revocation restitution fine moneys shall be deposited in the Restitution Fund in the State Treasury."

■■■ "When there is no parole eligibility, the [parole eligibility] fine is clearly not applicable." (*People v. Oganesyan* (1999) 70 Cal.App.4th 1178, 1183 [83 Cal.Rptr.2d 157]; *People v. Jenkins* (2006) 140 Cal.App.4th 805, 819 [44 Cal.Rptr.3d 788].) As appellants were each sentenced to life without the possibility of parole, there can be no parole, and therefore the parole revocation fine was improperly assessed.

## DISPOSITION

The judgments are modified to strike the parole revocation fines and are otherwise affirmed. The matter is remanded with directions to the trial court to correct appellants' abstracts of judgments to reflect that the victim restitution is imposed jointly and severally and to strike the parole revocation fines.

Doi Todd, J., and Chavez, J., concurred.

On April 16, 2009, the opinion was modified to read as printed above. Appellants' petition for review by the Supreme Court was denied July 8, 2009, S172769.