Filed 10/23/13  P. v. Rios CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>REYES RIOS, JR.,<br><br>      Defendant and Appellant. | B239242<br><br>(Los Angeles County<br>Super. Ct. No. NA085730) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Arthur H. Jean, Jr., Judge.  Affirmed.

Janet J. Gray, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson and Roberta L. Davis, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted defendant Reyes Rios, Jr., of three counts of attempted willful, deliberate, and premeditated murder (Pen. Code, §§ 664/187, subd. (a))[1] (counts 1-3); one count of shooting at an inhabited dwelling (§ 246) (count 4); one count of assault with a semiautomatic firearm (§ 245, subd. (b)) (count 5); and one count of possession of a firearm by a felon (§ 12021, subd. (a)(1)) (count 6). In all six counts, the jury found that the offense was committed for the benefit of, at the direction of, and in association with a criminal street gang (§ 186.22, subd. (b)). In counts 1 through 5, the jury found that all of the firearm-use allegations were not true. (§§ 12022.5, 12022.53, subds. (c), (d), (e)(1).)

The trial court found that defendant had suffered a prior strike conviction (§§ 667, subds. (b)-(i) & 1170.12, subds. (a)-(d)), a prior conviction of a serious felony (§ 667, subd. (a)(1)), and had served two prior prison terms resulting from three prior convictions (§ 667.5, subd. (b)).

The trial court sentenced defendant to a total of three consecutive life terms plus 37 years and four months in state prison. In counts 1 through 3, the court imposed a consecutive term of life with a minimum parole eligibility date of 30 years (15 years for the gang enhancement, doubled pursuant to the Three Strikes law), plus five years for the prior serious felony enhancement and one year for the prior prison term enhancement. In count 5, the court imposed a consecutive term of 18 years (the upper term of nine years, doubled pursuant to the Three Strikes law). In count 6, the court imposed a consecutive term of 16 months (one-third the midterm of 24 months, doubled pursuant to the Three Strikes law). The upper term sentence on count 4 was stayed pursuant to section 654.

Defendant appeals on the grounds that: (1) there is insufficient evidence to support his convictions for the attempted murders of two of the victims (counts 2 and 3); (2) there is insufficient evidence to support his conviction for aiding and abetting the assault with a deadly weapon charge in count 5; (3) the trial court erred when it instructed

---

[1]     All further references to statutes are to the Penal Code unless stated otherwise.

the jury that an aider and abettor is equally guilty, regardless of the extent or manner of participation; (4) the evidence was constitutionally insufficient to prove defendant had the specific intent to promote, further, or assist gang member criminal conduct; and (5) the trial court erred when it refused to address the jury's written request to explain the reasonable doubt instruction, requiring reversal of defendant's conviction.

## FACTS

**Prosecution Evidence**

### I. Shooting on Pine Avenue (Counts 1-4)

On January 17, 2010, Elizabeth Fuentes was preparing a barbecue in the courtyard of her Pine Avenue apartment home in Long Beach. Attending the barbecue were her five-year-old grandson, Andrew Navarrete; her son-in-law, Catarino Navarrete; her daughter, Sonia Jarez; and her son, Luis Salcido. Salcido was a member of the 18th Street gang and used the moniker "Solito." At approximately 5:00 p.m., Fuentes was standing outside, and Andrew was right next to her. Salcido and Navarrete stood at the door to the residence. Salcido had just arrived at the barbecue by bicycle from his sister's house, which was just a few blocks away. Fuentes saw a Hispanic man approach and pull out a gun from a distance of 20 to 25 feet from her. The man stood outside the courtyard and shot toward the screen door of Fuentes's residence, where Navarrete and Salcido were standing. Fuentes grabbed her grandson and put him in back of her. Andrew was not hit, but Fuentes was shot in the stomach. Bullets broke the glass windows to Fuentes's residence, and some bullets struck the inside of the residence, where Jarez and other members of the family were located when the shooting occurred. After firing several shots, the shooter walked back toward Pine Avenue. Navarrete and Salcido did not see the shooter because they were facing the other direction. Fuentes said the man was wearing black or "dark" and had a cap on his head. He was approximately five feet, six inches tall, weighed between 170 and 180 pounds, and had a mustache.

Fuentes was hospitalized for two weeks. Navarrete was shot on the right side of his body and in the arm. He was treated and released. Salcido was shot in the lower back

3

and spent a week in the hospital. He still had a bullet in his liver that was sometimes painful.

Salcido was in custody at the time of trial. He acknowledged that he had a prior conviction for robbery. Salcido testified that 18th Street and a gang called East Side Longos (ESL) were "not rivals or allies. They are just whatever." Salcido previously admitted to police that there was an ongoing rivalry between the two gangs.

Jorge Escalera Barajas heard the gunshots that afternoon from his residence near the intersection of 23rd Street and Pine Avenue. He looked out the window and saw a white- or cream-colored car that looked like a Jeep Cherokee with its engine running. He saw a Hispanic man with a hooded sweatshirt run to the car and get in the passenger side. The vehicle then sped away. Barajas could not see inside because the vehicle had tinted windows.

## II. Shooting on 11th Street (Count 5)

On February 11, 2010, Margaret Ellis was at her residence at 11th and Olive Streets in Long Beach when she witnessed some shots being fired. As she was looking out her window she saw a Hispanic male standing on the corner. He kept looking east toward Myrtle Street and walking from the corner to the middle of the street as he did so. She then saw a primer gray old style "Jeep" drive the wrong way on 11th Street and stop in front of her door. The male on the corner walked up to the passenger side of the vehicle and opened the door. When he came out, he had a gun in his hand.

The Hispanic man then walked back to the intersection as the vehicle drove off. Ellis suddenly heard shooting and saw the man shooting east on 11th Street. Ellis looked out the door and saw three Black males walking west on 11th Street. The Hispanic man was shooting at them. The three Black men turned around and ran. They turned right on Myrtle Street as the Hispanic male was steadily running and shooting at them.

The gray vehicle returned and drove past Ellis's residence on 11th Street, stopped at the stop sign, and turned right. Ellis jotted down the vehicle's license plate number. She gave the partial plate number 6KM744 to police. Ellis did not recall telling police

4

that she saw male Hispanic subjects arguing with three male Black subjects who were walking westbound on 11th Street.

### III.  *The Police Investigation*

Police found seven shell casings and two bullets at the scene of the Pine Avenue shooting.  Police found 10 casings and five bullet fragments at the scene of the shooting at 11th and Myrtle Streets.  Tests revealed that all 17 nine-millimeter shell casings were fired from the same gun.

The partial license plate number Ellis saw matched the license plate number (6KRM744) of a vehicle registered to defendant.  Defendant also owned an Isuzu Trooper with the license plate number 6GAC001.  Defendant had twice brought his Isuzu Trooper to a repair shop run by Jose Luis Cortez in order to have the vehicle repainted.  Cortez knew defendant as "Hyper."  Cortez's worker, Jaime Lopez, did the actual painting.  The first time Cortez saw the Isuzu it was red or orange.  In 2009, the Trooper was painted beige or a cream color.  A few months later, sometime in 2010, Lopez painted it gray.

Because of ongoing investigations being conducted by Detective Hugo Cortes of the Long Beach Police Department, in March 2010 a wiretap was authorized of telephones belonging to defendant and other persons who were members of ESL.  On April 15 and 19, 2010, police tried to stimulate conversation about the shootings among the people who were being tapped.  The police asked for the assistance of the Press Telegram to disseminate certain information.  The first press release contained a partial description of the suspect, a vehicle description, and a sketch of an Isuzu Trooper.  The second press release contained a sketch of defendant made from an old booking photograph.

Among the recorded conversations was one between defendant and Lopez in which they discussed the sanding down and repainting of defendant's Trooper.[2]  The jury

---

[2]      Pertinent portions of the recorded conversations are discussed within the opinion.

heard several conversations between defendant and Ruhani Bustamante, a fellow ESL member.

Police discovered defendant's Isuzu Trooper in Compton and took it to the police tow yard, where it was searched. Defendant's registration was inside. Police found a dismantled nine-millimeter handgun wrapped in a blue bandana behind the interior panels on the rear passenger side. The slide and magazine were present but removed from the weapon. A box of nine-millimeter ammunition was behind the gun. Police found an insurance card that listed a 1990 Toyota 4Runner as also being registered to defendant. The 4Runner was never located.

### IV. Gang Evidence

Long Beach Police Officer Chris Zamora testified as a gang expert. He testified that respect for the gang is very important in the gang culture. When gangs feel respected it may only mean they are feared. The gangs maintain their territory by intimidating the community. Officer Zamora had investigated the ESL gang for the bulk of his career. He gave a conservative estimate that the gang had 900 members. Officer Zamora described the primary activities of ESL, ranging from assaults to shootings, and stated that their rivals include all of the Crips gangs, which are primarily African-American. Certified court documents and Officer Zamora's testimony established that ESL members had committed predicate offenses. Officer Zamora identified defendant and gave his opinion that he was an active member of ESL with the moniker "Big Hyper."

Officer Zamora stated that Fuentes's residence on Pine Avenue was within ESL's territory. The scene of the 11th Street shooting was also within ESL's territory. In the latter location, the ESL gang was "running up against Insane Crips and Rolling 20's gang territory."

When given a hypothetical based on the facts of the Pine Avenue shooting, Officer Zamora stated that the shooting was committed for the benefit of, in association with, and for the furtherance of ESL. Officer Zamora's opinion was based on the fact that a rival gang member was in ESL territory, and territory is very important to a gang. Doing a violent act gets rid of the rival or instills fear in him and his gang.

Based on a hypothetical scenario rooted in the facts of the 11th and Myrtle Streets shooting, Officer Zamora stated that the shooting was committed for the benefit of, at the direction of, and in association with ESL. Officer Zamora asserted that the shooting also had its roots in the gangs trying to maintain their territory. This kind of crime instills fear in the community. ESL often committed race-based crimes because it scares not only rival gang members but the entire community, since anyone could be shot just because of his or her race. Moreover, the participation of two people in the shooting was common in gang-related shootings. The nonshooter acted as a lookout, getaway driver, and a witness to the act so that the shooter could later take credit and raise his status in the gang.

With regard to count 6, which charged defendant with being a felon in possession of a firearm, the parties stipulated that defendant had a prior felony conviction.

**Defense Evidence**

Defendant did not testify or offer any evidence on his behalf.

## DISCUSSION

### I. Sufficiency of the Evidence in Counts 2 and 3

#### A. *Defendant's Argument*

Defendant argues that there is insufficient evidence he intended to aid and abet the attempted murders of Fuentes and Navarrete, since there is no evidence that he shared the concurrent intent necessary to find him guilty under the "kill zone" theory. Defendant argues that the error is not only one of state law, but also a denial of due process under the United States Constitution.

#### B. *Relevant Authority*

"In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.) "The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence." (*Ibid*.) "The federal standard of review is to the same effect: Under

7

principles of federal due process, review for sufficiency of evidence entails not the determination whether the reviewing court itself believes the evidence at trial establishes guilt beyond a reasonable doubt, but, instead, whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Ibid*.; see also *Jackson v. Virginia* (1979) 443 U.S. 307, 318-319.)

Under the kill zone theory, "a shooter may be convicted of multiple counts of attempted murder . . . where the evidence establishes that the shooter used lethal force designed and intended to kill everyone in an area around the targeted victim (i.e., the 'kill zone') as the means of accomplishing the killing of that victim. Under such circumstances, a rational jury could conclude beyond a reasonable doubt that the shooter intended to kill not only his targeted victim, but also all others he knew were in the zone of fatal harm. [Citation.]" (*People v. Smith* (2005) 37 Cal.4th 733, 745-746.)

The culpability for the attempted murders of any within the kill zone is based on a theory of concurrent intent rather than transferred intent. (*People v. Bland* (2002) 28 Cal.4th 313, 331 (*Bland*).) "The conclusion that transferred intent does not apply to attempted murder still permits a person who shoots at a group of people to be punished for the actions towards everyone in the group even if that person primarily targeted only one of them." (*Id*. at p. 329.)

### C. *Evidence Sufficient*

According to defendant, the prosecution was required to establish that defendant aided and abetted the shooter's concurrent intent to create a kill zone around every person who was near the intended target. And, since the kill zone theory relies on a legal fiction—that the shooter's malice would be inferred by reason of shooting into an area occupied by more than the target—it is difficult to imagine under the circumstances of the case, how such an intent could be found. Defendant asserts that there was simply no evidence that defendant, acting as an aider and abettor, intended to aid and abet the attempted murder of victims within the kill zone.

8

The elements of attempted murder are specific intent to kill and a direct but ineffectual act toward accomplishing the intended killing. (*People v. Smith*, *supra*, 37 Cal.4th at p. 739.) The kill zone instruction relates only to the intent element, which is the only element defendant disputes. (*People v. McCloud* (2012) 211 Cal.App.4th 788, 804.) "One who intentionally attempts to kill another does not often declare his state of mind either before, at, or after the moment he shoots. Absent such direct evidence, the intent obviously must be derived from all the circumstances of the attempt, including the putative killer's actions and words." (*People v. Lashley* (1991) 1 Cal.App.4th 938, 945-946.)

As for aiding and abetting liability, the jury was instructed that it had to find that defendant acted with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing or encouraging or facilitating the commission of the crime, and that by act or advice he aided promoted, encouraged, or instigated the commission of the crime. The jury was also instructed that a person who aids and abets the crime need not be present at the scene of the crime, although this is a factor to consider in determining if a defendant aided and abetted. (CALJIC No. 3.01.) (See *People v. Campbell* (1994) 25 Cal.App.4th 402, 409.) Other factors include the defendant's companionship or relationship with the perpetrator and his conduct before and after the offense. (*Ibid*.)

In determining the sufficiency of the evidence, each case must turn on its own particular facts. (*People v. Smith*, *supra*, 37 Cal.4th at p. 745.) In the instant case, the circumstantial evidence of the shooter's intent clearly showed an intent to kill everyone in the vicinity of the intended target, Salcido. The shooter shot a semiautomatic weapon at least seven times into a family group consisting of three adults and a child. All of them were in a relatively confined space in the courtyard of an apartment building. The shooter actually struck all three adults, even though they were in different places within the area of the courtyard. This is a clear indication that the shooter shot wildly and sprayed the family members with bullets. Concurrent intent exists "'when the nature and scope of the attack, while directed at a primary victim, are such that we can conclude the

9

perpetrator intended to ensure harm to the primary victim by harming everyone in that victim's vicinity." (*Bland*, *supra*, 28 Cal.4th at p. 329.) "'[T]the trier of fact may reasonably infer from the method employed an intent to kill others concurrent with the intent to kill the primary victim. . . . Where the means employed to commit the crime against a primary victim create a zone of harm around that victim, the factfinder can reasonably infer that the defendant intended that harm to all who are in the anticipated zone.'" (*Id*. at p. 330.)

The jury could reasonably infer that defendant waited in his vehicle with the engine running after having supplied the weapon and thereby shared the intent of the actual shooter. Thus defendant was present at the scene of the crime, even though his presence was not required in order for him to be an aider and abettor. Defendant's wiretapped conversations with a fellow gang member showed that the shooting was a gang "job," and thus defendant shared companionship with the shooter, another factor supporting a shared intent. Defendant took the shooter to the scene, and, after the shooting, the perpetrator ran to the Trooper and defendant sped away, which are also factors in support of a finding that defendant was an aider and abettor. (See *People v. Campbell*, *supra*, 25 Cal.App.4th at p. 409.) Defendant's recorded conversation with Bustamante showed that the gun used in the shooting actually belonged to defendant. The fact that Salcido arrived at the barbecue only minutes before the volley of shots began indicates that defendant and the shooter either followed Salcido as he cycled the few blocks to his mother's house, or they were lying in wait. In any event, the shooter and the driver knew that there were likely to be other people in the courtyard that Salcido had just entered. It was an apartment building, and any number of residents could have been in the line of fire. Defendant evinced no surprise when Bustamante read to him that there was a $10,000 reward for information leading to the arrest and conviction of this person responsible for the shooting that injured a woman and two men." Defendant merely replies, "Yeah."

In the instant case, the fact that defendant as an aider and abettor supplied the transportation and the weapon and waited while the shooter entered the courtyard of an

10

apartment building occupied by multiple families with the intent to kill, clearly shows his concurrent intent with the shooter. The "'nature and scope of the attack'" supports the conclusion that the shooter intended to kill Salcido and anyone who was near him. (*Bland*, *supra*, 28 Cal.4th at pp. 329-331.) The jury reasonably arrived at the inference that defendant shared the shooter's intent to kill anyone and everyone in the zone. Defendant was properly convicted of the attempted murders of Fuentes and Navarrete.

## II. Sufficiency of the Evidence in Count 5

### A. Defendant's Argument

Defendant contends there is insufficient evidence that he aided or abetted the assault with a deadly weapon in count 5, which took place at 11th and Myrtle Streets. He asserts that he was not placed at the scene, and the wiretapped calls did not evidence his knowledge of the incident, let alone his complicity with its commission. Even though a vehicle registered to defendant was placed at the scene, this is insufficient evidence that he was driving the car or was otherwise aware of the crime.

### B. Relevant Authority

The standard of review for insufficiency of the evidence and the elements of aider and abettor liability are discussed in the first portion of this opinion.

### C. Evidence Sufficient

Margaret Ellis testified that she saw a Hispanic male standing on the corner and looking around. She saw a gray vehicle, which looked like an older Jeep, pull up in front of her house, and the man from the corner walked up to the passenger side of the Jeep and opened the door. He then came out of the Jeep with a gun in his hand. Suddenly, shots rang out and she saw the man shooting eastward on 11th Street while the man in the Jeep drove off. Ellis saw that the Hispanic male was shooting at three Black men.

When the Jeep came back, Ellis saw and recorded its license plate number. The number she gave the police was a partial number, i.e., 6KM744. The license plate was later connected to defendant. The title to two automobiles found at defendant's residence showed that he owned vehicles with license plate numbers 6GAC001 (an Isuzu) and 6KRM744 (a Toyota).

11

After police arranged to have information printed in the newspaper about the two cases with a description and sketches of the suspect and the vehicle, defendant and Ruhani Bustamante had a telephone conversation. Contrary to defendant's assertion, their conversation clearly implicates defendant in the 11th and Myrtle Streets shooting. Bustamante informs defendant that *his* "Jeeps" was sketched in the paper along with "a picture that looks like you in a sketch fool." Bustamante reads the newspaper report to defendant. The report connected the vehicle and the suspect to both the Pine Avenue and the 11th Street shootings. Bustamante says, "Anyways fool it shows, it shows your vehicle fool." Defendant asks what color the car is in the drawing, and Bustamante says it is white because it is just a drawing. Bustamante tells defendant to "just get rid of it." Defendant asks if the 11th and Myrtle was part of it, and Bustamante says it was and asks, "*Did you throw, did you tell anyone about that*?" When he asks if defendant told a specific person (the Paisa) defendant replies, "*No that dude don't know*." Bustamante tells defendant to just get rid of his car and shave off his mustache and his head hair. Bustamante later says "they are linking that one up to the one on Myrtle fool that is why I'm telling you fool *they are on to everybody*, fool. . . ." During one of their several conversations in which they speculate about who is talking, Bustamante says, "It could be that little fucken hina that lives there. She probably saw the license plate to the ranfla (car). What it looks like, remember? She was looking out the window?" Defendant responds, "Yeah."

Bustamante then tells defendant to take his old nine-millimeter gun away from whoever has it. He specifies that it is the gun they used at the 2200 block with "the eighteen streeters." He says that "they" went on to use it at the Myrtle Street shooting, and Bustamante scolded defendant for not having cut it up as he had been told to do. Again contrary to defendant's assertion, this exchange does not indicate that defendant was not involved in the 11th and Myrtle Streets shooting, but only that Bustamante was not aware of which gun the shooter used in that shooting.

With respect to defendant's vehicle, another caller tells defendant that "they said that white over there with the lady over there on Pine" and "over here primered with the

Blacks." Defendant later calls someone to see if they have the newspaper for the 17th because "they say . . . the Trooper is coming up on it." Defendant tried to have his car repainted after the sketch of the car and the suspect appeared in the newspaper. Defendant actually asked Lopez to sand his car down to get rid of all of the white and gray paint and to go back to the red so that one could never tell that it was anything but red. He also told Lopez to take off the tire in the rear, the part that held the tire, and to cover up the holes where it was attached. Defendant changed his appearance to appear different than the sketch.

Later defendant tells Bustamante that he threw the "juguete," or the toy, in the ocean personally. He then says he disassembled it into different pieces and threw it in several places. He tells someone else he threw the "slingshot" in the water.

On June 3, 2010, Detective Sorenson searched defendant's Isuzu Trooper in the city tow yard and found parts of a disassembled nine-millimeter handgun wrapped in a blue bandana behind the interior panels in the cargo area of the car. The magazine was out and the slide was removed. There was a box of nine-millimeter ammunition behind the gun.

Troy Ward, a firearms examiner, examined seven cartridge cases from the Pine Street shooting and 10 fired nine-millimeter cartridge cases with respect to the 11th and Myrtle Streets shooting. The 10 cartridge cases were all fired by one firearm, and the seven cartridges were also fired from one firearm. A comparison of the cartridges revealed that all 17 were fired from the same gun. That gun was the disassembled gun found in defendant's Isuzu.

Finally, there was expert evidence that all of the Crips gangs, which are primarily African-American gangs, are direct rivals of ESL, defendant's gang, and have been for several decades. The area of 11th and Myrtle Streets is one where their territories "butt up against each other."

"'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court which must be convinced of

13

the defendant's guilt beyond a reasonable doubt. If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment.' [Citation.]" (*People v. Perez* (1992) 2 Cal.4th 1117, 1124.) Given the abundance of circumstantial evidence and the incriminating statements discussed *ante*, we conclude the evidence was sufficient to support defendant's conviction as an aider and abettor of the shooting on 11th and Myrtle Streets.

## III. Aiding and Abetting Instruction

### A. Defendant's Argument

Defendant contends the trial court erred by instructing the jury with CALJIC No. 3.00, which contained language stating that each principal, regardless of the extent or manner of participation, is equally guilty. He argues that the trial court had the duty to instruct the jury that he could be guilty of a lesser offense than the actual perpetrator. If the trial court had no such sua sponte duty, defense counsel was ineffective in failing to request a proper instruction.

### B. Proceedings Below

The trial court instructed the jury with CALJIC No. 3.00 that "Persons who are involved in committing a crime are referred to as principals in that crime. Each principal, regardless of the extent or manner of participation is equally guilty. Principals include: Those who directly and actively commit the act constituting the crime, or those who aid and abet the commission of the crime."

### C. Relevant Authority

Generally, an aider and abettor is guilty of the crime he or she intended to aid and abet. (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117 (*McCoy*).) "If the mens rea of the aider and abettor is more culpable than the actual perpetrator's, the aider and abettor may be guilty of a more serious crime than the actual perpetrator." (*Id*. at p. 1120.) Conversely, if the aider and abettor's mens rea is less culpable, the aider and abettor may be guilty of a lesser crime. (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1164 (*Samaniego*).)

14

Purportedly erroneous instructions are reviewed in the context of the entire charge to determine whether it is reasonably likely the jury misconstrued or misapplied the challenged instruction in a manner that violates the Constitution. (*People v. Frye* (1998) 18 Cal.4th 894, 957, disapproved on another point in *People v. Doolin* (2009) 45 Cal.4th 390, 421 & fn. 22; *People v. Holt* (1997) 15 Cal.4th 619, 677.)

### D.  No Error

We first agree with respondent that defendant has forfeited this claim.  A party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested modification or amplification.  (*People v. Lee* (2011) 51 Cal.4th 620, 638.)

In *Samaniego*, this court considered whether a challenge to CALCRIM No. 400— the CALCRIM instruction corresponding to CALJIC No. 3.00—had been forfeited by the defendant's failure to object to the instruction below.  (*Samaniego*, *supra*, 172 Cal.App.4th at pp. 1162-1163.)  We determined that, since CALCRIM No. 400 is generally an accurate statement of law, the defendant was obliged to request modification or clarification and, having failed to do so,  forfeited his challenge to the instruction.  (*Id*. at p. 1163)

In the instant case, defendant failed to object to CALJIC No. 3.00 or to request clarifying or amplifying language, and we do not believe defendant's substantial rights would be affected by a forfeiture.  CALJIC No. 3.00 is a correct statement of the law that instructs the jury that an aider and abettor is as guilty as a principal in the offense the perpetrator commits.  Because defendant did not ask the court to correct or clarify an otherwise accurate statement of general legal rules, he cannot complain on appeal that the reading of the instruction was error, and he has therefore forfeited his claim on appeal. (*People v. Lee*, *supra*, 51 Cal.4th at p. 638.)

Defendant also argues that any forfeiture of his claim was due to his counsel's failure and that this failure constitutes ineffective assistance of counsel.  The burden is on defendant to establish ineffective assistance by a preponderance of the evidence.  (*People v. Ledesma* (1987) 43 Cal.3d 171, 218.)  There are two elements to an ineffective

assistance claim. "[A] defendant seeking relief on the basis of ineffective assistance must show both that trial counsel failed to act in a manner to be expected of reasonably competent attorneys acting as diligent advocates, and that it is reasonably probable a more favorable determination would have resulted in the absence of counsel's failings." (*People v. Cudjo* (1993) 6 Cal.4th 585, 623, citing *Strickland v. Washington* (1984) 466 U.S. 668.) A reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." (*Strickland*, at p. 697.)

In the instant case, even if the claim were not forfeited we would find it meritless. Therefore, defendant suffered no prejudice from counsel's failure to object. As we observed in *Samaniego*, an instruction such as CALJIC No. 3.00 may have the potential to mislead the jury in certain cases. (*Samaniego*, *supra*, 172 Cal.App.4th at p. 1165.) We noted that the Supreme Court in *McCoy*, *supra*, 25 Cal.4th at page 1122, concluded that an aider and abettor could be guilty of a greater offense than the direct perpetrator, and we determined that *McCoy*'s reasoning led inexorably to the further conclusion that an aider and abettor's guilt may also be less than the perpetrator's, if the aider and abettor has a less culpable mental state. (*Samaniego*, *supra*, 172 Cal.App.4th at p. 1164; see also *People v. Woods* (1992) 8 Cal.App.4th 1570, 1577 (*Woods*).) Nevertheless, we stated that the "equally guilty" language was "generally correct in all but the most exceptional circumstances," although in *Samaniego* we found it misleading. (*Samaniego*, at p. 1165; cf. *People v. Nero* (2010) 181 Cal.App.4th 504, 518 (*Nero*) [the instruction can be misleading even in unexceptional circumstances].)

Here, even if the jury believed someone else was the shooter and defendant was an aider and abettor, it necessarily found the following regarding defendant in order to find that he aided and abetted the attempted murders: defendant knew the shooter intended to murder or attempt to murder the victims; defendant intended to commit, encourage, or facilitate the commission of murder and attempted murder; and defendant did something that in fact aided, promoted, encouraged, or instigated the commission of murder and attempted murder (CALJIC No. 3.01). Thus, the jury necessarily found that defendant

16

must have intended that the victims be killed, which means he shared the intent to kill them. "Absent some circumstance negating malice one cannot knowingly and intentionally help another commit an unlawful killing without acting with malice." (*McCoy*, *supra*, 25 Cal.4th at p. 1123.) Moreover, "[i]t would be virtually impossible for a person to know of another's intent to murder and decide to aid in accomplishing the crime without at least a brief period of deliberation and premeditation, which is all that is required" for first degree murder, and for the premeditated attempted murder in this case. (*Samaniego*, *supra*, 172 Cal.App.4th at p. 1166.)

Moreover, even if the trial court erred in instructing the jury with CALJIC No. 3.00, any such error was harmless. We review instructional error with respect to CALJIC No. 3.00 using the harmless error test under *Chapman v. California* (1967) 386 U.S. 18, 24. (See *Samaniego*, *supra*, 172 Cal.App.4th at p. 1165.) Under that test, we find the error harmless if we determine beyond a reasonable doubt that the jury verdict would have been the same absent the error. (*Ibid*.)

Instructing the jury that principals are "equally guilty" amounts to reversible error when the trial court precludes the jury from making appropriate findings under other instructions. (*Samaniego*, *supra*, 172 Cal.App.4th at pp. 1165-1166 [no reversible error where the jury made appropriate findings under other instructions].) In the instant case, the court's additional instructions correctly and specifically described the mental state necessary to find defendant guilty under an aiding and abetting theory.

As noted, the trial court instructed with CALJIC No. 3.01, which defines the elements of aiding and abetting.[3] CALJIC No. 3.01 provided a detailed explanation of

---

[3] CALJIC No. 3.01, as read to defendant's jury, states: "A person aids and abets the commission of a crime when he or she: [¶] (1) With knowledge of the unlawful purpose of the perpetrator, and [¶] (2) With the intent or purpose of committing or encouraging or facilitating the commission of the crime, and [¶] (3) By act or advice, aids, promotes, encourages or instigates the commission of the crime. [¶] A person who aids and abets the commission of a crime need not be present at the scene of the crime. [¶] Mere presence at the scene of a crime which does not itself assist the commission of the crime

17

the principles underlying an aiding and abetting theory in contrast to CALJIC No. 3.00, which was merely a brief introduction of general principles to apply when more than one person is involved in committing a crime. We see no reasonable possibility that the jury failed to understand that CALJIC Nos. 3.00 and 3.01, when read together, required the jury members to evaluate defendant's personal mental state as separate from the mental state of the shooter in order to determine his culpability, especially since defendant was tried alone.

The jury was also instructed that its sole duty was to decide whether the People have proved the guilt of the defendant on trial. (CALJIC No. 2.11.5.) The jury was directed to consider the instructions as a whole and each in light of all the others. (CALJIC No. 1.01.) The trial court instructed the jury in terms of CALJIC No. 3.31, that there must be a union of act and specific intent. The jury was separately instructed on attempted murder as a violation of sections 664 and 187 (CALJIC No. 8.66). The court also instructed with CALJIC No. 8.67, defining "willful," "deliberate," and "premeditated" attempted murder. The totality of the court's instructions ensured that the jury found the requisite mental state to convict defendant of premeditated attempted murder.

Moreover, unlike the cases of *Nero* and *Woods*, the jury had no queries in regard to these instructions. Specifically, the jurors did not ask the trial court whether the jury could convict defendant of a lesser included offense. (Cf. *Nero*, *supra*, 181 Cal.App.4th 504, 509-510 [prejudicial error for court to inform jury that aider and abettor and perpetrator are "equally guilty" when jury asked whether it could convict aider and abettor of lesser offense]; *Woods*, *supra*, 8 Cal.App.4th at p. 1579 [jury asked trial court if an aider and abettor could be found guilty of second degree murder if the actual perpetrator is guilty of first degree murder].) There is no indication that the jury was misled by CALJIC No. 3.00.

does not amount to aiding and abetting. [¶] Mere knowledge that a crime is being committed and the failure to prevent it does not amount to aiding and abetting."

18

Finally, as discussed *ante*, the evidence adduced at trial in support of an attempted murder conviction against defendant was strong and showed that he and an accomplice planned to kill Salcido and anyone else in the line of fire. There is no indication or suggestion that when the shooter fired into the courtyard, he and the waiting getaway driver (who also supplied the gun) harbored different mental states. The jury found the gang allegations true, i.e., that the attempted murders and assault were committed "for the benefit of, at the direction of, or in association with any criminal street gang," within the meaning of section 186.22, subdivision (b)(1), and with the "specific intent to promote, further, or assist in any criminal conduct by gang members" within the meaning of section 186.22, subdivision (b)(1). There was overwhelming evidence of the gang allegations, and evidence of those allegations showed that the attempted murders and assault were committed with the required specific intent. (See *Samaniego*, *supra*, 172 Cal.App.4th at p. 1165 [true finding on multiple murder special circumstance showed defendants had the specific intent to kill].)

Accordingly, even if the trial court had not instructed the jury with CALJIC No. 3.00, it is beyond a reasonable doubt that the jury would have convicted defendant of attempted murder as an aider and abettor. Trial counsel was not ineffective for failing to object to the reading of CALJIC No. 3.00, since the instruction is a correct statement of law and there were no grounds for finding defendant guilty of a lesser crime, and the reading of the instruction did not prejudice defendant. Defendant's argument is without merit.

## IV. Sufficiency of the Evidence of Gang Allegation

### A. *Defendant's Argument*

According to defendant, the prosecutor failed to present substantial evidence to support the gang allegations that the charged crimes were part of a gang-related enterprise and committed with the intent to benefit a gang. The evidence presented was mere unsubstantiated, speculative opinion of an expert who relied on the often-used generality that an assault benefits the gang to establish territory and intimidate the

19

neighborhood. Defendant asserts that his gang enhancements be stricken, requiring remand of the associated sentences.

### B. Relevant Authority

To subject a defendant to the consequences of section 186.22, the prosecution must prove that the crimes for which the defendant was convicted were "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(1); see also *People v. Gardeley* (1996) 14 Cal.4th 605, 616-617; *People v. Villalobos* (2006) 145 Cal.App.4th 310, 322.) Not all crimes committed by gang members fall within the purview of section 186.22, subdivision (b). (See *People v. Ochoa* (2009) 179 Cal.App.4th 650, 661-663 & fn. 7; *People v. Ramon* (2009) 175 Cal.App.4th 843, 853; *In re Frank S.* (2006) 141 Cal.App.4th 1192, 1199.)

A trier of fact may rely on expert testimony about gang culture and habits to reach a finding on a gang allegation. (*In re Frank S.*, *supra*, 141 Cal.App.4th at p. 1196; *People v. Ferraez* (2003) 112 Cal.App.4th 925, 930.) However, a gang expert's testimony alone is insufficient to find an offense gang related. (*People v. Ochoa*, *supra*, 179 Cal.App.4th at p. 657; *Ferraez*, at p. 931.) "'[T]he record must provide some evidentiary support, other than merely the defendant's record of prior offenses and past gang activities or personal affiliations, for a finding that the *crime* was committed for the benefit of, at the direction of, or in association with a criminal street gang.' [Citation.]" (*Ochoa*, at p. 657.)

### C. Evidence Sufficient

We believe the testimony offered by the gang expert in conjunction with defendant's revealing telephone calls and the circumstances surrounding the shootings provide ample evidence to show the instant crimes were committed for the benefit of a criminal street gang.

Officer Zamora testified that fear, which gang members consider to be respect, is important to gangs because it helps them maintain their territory. Among ESL's rivals were the 18th Street gang and any African-American Crips gang. ESL claimed central

Long Beach, east of the 710 freeway, as its main territory. Fuentes's residence on Pine Avenue was within ESL's territory. Her son, a member of ESL's rival gang, was visiting her when the shooting occurred. The scene of the 11th Street shooting was also within ESL's territory, and it bordered the territory of rival African-American gangs. African-American males were the shooter's targets.

Officer Zamora was of the opinion that defendant was a member of ESL because of defendant's gang tattoos and his admission of membership to officers, including Officer Zamora. When read a hypothetical question based on the facts of the Pine Avenue shooting, Officer Zamora stated that the shooting was committed for the benefit of, in association with, and for the furtherance of ESL. This was due to the importance territory holds in gang culture. ESL took violent action against a rival gang member in its territory so as to instill fear in both the rival gang and the community. Although that rival gang member (Salcido) testified at trial that 18th Street and ESL were "not rivals or allies. They are just whatever," the record shows he had previously admitted to police that there was an ongoing rivalry between the two gangs.

When given another hypothetical based on the facts of the 11th and Myrtle Streets shooting, Officer Zamora asserted that the shooting was committed for the benefit of, at the direction of, and in association with ESL. This opinion was also rooted in the importance of territory in gang culture. Officer Zamora explained that it was irrelevant if the African-American victims were actually members of a rival gang, since their race and presence in ESL territory qualified them as ESL targets. The shooting instilled fear in the community and in rival African-American gangs. The area in which the shooting occurred was at the border where the ESL territory meets the African-American gangs' territory. The fact that two people participated in the shooting was common in gang-related shootings, because the nonshooter could act as a lookout, the getaway driver, and a witness to the act so the shooter could later take credit and raise his status in the gang.

Defendant's conversations with Bustamante confirm that the shootings were committed at a minimum in association with ESL gang members. (See *People v. Morales* (2003) 112 Cal.App.4th 1176, 1198 ["The crucial element . . . requires that the

21

crime be committed (1) for the benefit of, (2) at the direction of, *or* (3) in *association with a gang.*"].)  Bustamante, in referring to defendant's nine-millimeter weapon, states, "You hear me *the one that we used at the 2200 block right there fool the with the eighteen streeter's,* remember?"  He later asks defendant if he doesn't remember the job that they did "over there with the eighteen streeters, dude."  Bustamante then states that the police are linking the Pine Street incident to "the one on Myrtle fool that is why I'm telling you fool they are on to everybody fool."  They both suspect that someone they call "el pinche guero" is the only one that knows about the "job," and Bustamante says that they need to "invite him somewhere" and "take him down."  Bustamante scolds defendant because the gun used at the Pine Street shooting was given to someone who used it at the 2200 block of Myrtle Street, and Bustamante had told defendant to cut up the gun.  These conversations and the circumstances of the shootings clearly support the inference that the shootings were committed by defendant with other gang members.

Accordingly, we conclude the evidence was sufficient to support the gang allegations.

## V.  Jury Query Regarding Reasonable Doubt Instruction

### A.  *Defendant's Argument*

Defendant contends the trial court committed reversible error when it refused to provide further clarification regarding the reasonable doubt instruction, CALJIC No. 2.90.  According to defendant, the error affected defendant's constitutional rights to due process and was not harmless beyond a reasonable doubt.

### B.  *Proceedings Below*

The court instructed the jury on reasonable doubt pursuant to CALJIC No. 2.90 as follows:  "A defendant in a criminal action is presumed to be innocent until the contrary is proved.  And in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to a verdict of not guilty.  This presumption places upon the People the burden of proving him guilty beyond a reasonable doubt.  Reasonable doubt is defined as follows:  It is not a mere possible doubt because everything relating to human affairs is open to some possible or imaginary doubt.  It is that state of the case which after the

22

entire comparison and consideration of all of the evidence leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge."

At the end of opening argument, the prosecutor told the jury it was his burden to prove the charges beyond a reasonable doubt, and he again read the reasonable doubt instruction to the jury. The jury began deliberating in the afternoon of November 1, 2011, and resumed deliberations at 9:30 a.m. the next day. At 10:10 a.m., the jury sent questions to the trial court, including the following: "Can you redefine reasonable doubt?" After discussing the questions with the parties, the trial court responded "No" to the reasonable doubt query. The court told the jury that counsel had approved the responses. The court added, "It is one of those things that cannot be defined any further." At 10:25 a.m., the jury announced it had reached verdicts.

## C. Relevant Authority

The federal Constitution does not require a trial court to define reasonable doubt. (*People v. Aranda* (2012) 55 Cal.4th 342, 374 (*Aranda*).) The failure to do so is, however, error under state law. (*Id.* at pp. 350, 374.)

Pursuant to section 1138, the trial court must provide information requested by a jury concerning any point of law. (*People v. Beardslee* (1991) 53 Cal.3d 68, 97.) The trial court has the discretion to determine what additional explanations or definitions are needed to satisfy the jury's request for information if the instructions given are full and complete. (*Ibid.*)

## D. No Abuse of Discretion

We first observe that defendant has forfeited this claim. The California Supreme Court, in *People v. Rodrigues* (1994) 8 Cal.4th 1060, held that a defendant who believes that an instruction is unclear has a duty to request clarifying language. Failure to request such clarification bars appellate review of the issue. (*Id.* at p. 1192; see also *People v. Kelly* (1992) 1 Cal.4th 495, 535-536 [trial court not required to modify accepted standard instructions without request by party ].)

23

In any event, we conclude that the trial court properly responded to the jury's inquiry. When standard jury instructions are adequate, a trial court does not abuse its discretion by declining to elaborate on them. (*People v. Garceau* (1993) 6 Cal.4th 140, 191.) Moreover, CALJIC No. 2.90 has been recognized as "'the best available definition of the standard of proof beyond a reasonable doubt.'" (*Garceau*, at p. 193.)

Furthermore, it has been held that varying from the standard is a "'perilous exercise.'" (*People v. Freeman* (1994) 8 Cal.4th 450, 503-504.) Prejudicial error has sometimes been found when a trial court has made misguided attempts to expand on the standard definition. (See, e.g., *People v. Johnson* (2004) 115 Cal.App.4th 1169, 1172 [reversal required where trial court said, "people planning vacations or scheduling flights engage in a deliberative process to the depth required of jurors[,] or that such people finalize their plans only after persuading themselves that they have an abiding conviction of the wisdom of the endeavor"].) Even paraphrasing the standard jury instruction on reasonable doubt can be dangerous. (See, e.g., *People v. Johnson* (2004) 119 Cal.App.4th 976, 985; *People v. Garcia* (1975) 54 Cal.App.3d 61, [citing cases with examples of "innovative 'reasonable doubt' instructions" held to be erroneous] and noting that "Well intentioned efforts to 'clarify' and 'explain' [the accepted definition] have had the result of creating confusion and uncertainty, and have repeatedly been struck down by the courts of review of this state."].) It is certain that reversal is required when any modification to the instruction results in a reasonable likelihood that a juror understood the modified language to lessen the prosecution's burden of proof. (See *Victor v. Nebraska* (1994) 511 U.S. 1, 5 [reasonable doubt jury instruction cannot suggest a higher degree of doubt that is required for acquittal]; *People v. Mayo* (2006) 140 Cal.App.4th 535, 542 ["an instruction that lowers the People's burden of proof or detracts from the heavy burden suggested by use of the term 'reasonable doubt' is federal constitutional error requiring reversal per se . . ."].)

Because the standard jury instruction was clearly adequate, there was no abuse of discretion, and the trial court wisely chose to refrain from entering these dangerous waters. Moreover, any error in this regard was harmless under any standard. (*Chapman*

*v. California*, *supra*, 386 U.S. 18 [harmless beyond a reasonable doubt]; *People v. Watson*, *supra*, 46 Cal.2d at p. 836 [reasonable probability the error did not affect the outcome].)  The jury found "not true" the firearm allegations, including the allegation that a principal used a firearm, which indicates that the jury members gave defendant the benefit of any doubt they might have harbored.  Moreover, as we have concluded, there was overwhelming evidence of defendant's participation in both shootings and his possession of a firearm.  There was also strong evidence in support of the gang enhancements, as explained in the previous section.  In light of this evidence, any error was harmless.

## DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


BOREN, P.J.

We concur:


ASHMANN-GERST, J.


CHAVEZ, J.