Filed 11/16/23  P. v. Burguan CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ANTHONY ANGEL BURGUAN,<br><br>    Defendant and Appellant. | B319150<br><br>(Los Angeles County<br>Super. Ct. No. KA113425) |

APPEAL from an order of the Superior Court of Los Angeles County, Mike Camacho, Judge.  Affirmed.

Eric R. Larson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill, Supervising Deputy Attorney General, and Nima Razfar, Deputy Attorney General, for Plaintiff and Respondent.

A jury convicted defendant and appellant Anthony Burguan (defendant) of special circumstance murder, attempted murder, and attempted robbery. The jury also found true, among other things, allegations that defendant committed the crimes for the benefit of, at the direction of, and in association with a criminal street gang. After trial but before sentencing, a new statute concerning gang enhancements, Penal Code section 1109, took effect.[1] (Stats. 2021, ch. 699, § 5, eff. Jan. 1, 2022.) The statute requires a court to bifurcate—upon a defendant's request—trial on a gang enhancement from trial of the underlying offense(s). We are asked to decide whether reversal of defendant's convictions is required because section 1109 applies retroactively to him.

## I. BACKGROUND

### A. The Murder

On August 12, 2016, 17-year-old Christine Nguyen threw a party in her mother's backyard in West Covina. Though Nguyen had permission to have only about 20 friends over, approximately 100 people attended. The party was advertised on social media, and attendees paid a small entrance fee.

Among the attendees were Christian Gallegos (Gallegos) and his friends Jose Melendez (Melendez), the murder victim, and Rigoberto Saldana (Saldana). Saldana and Melendez brought a nitrous oxide (nox) tank with the intent of selling nox-filled balloons to partygoers.

---

[1] Undesignated statutory references that follow are to the Penal Code.

Also at the party were defendant and Andrew Horcasitas (Horcasitas). A handful of other attendees interacted with defendant while he was there. Among them was Adrian Contreras (Contreras), who recognized defendant from high school and a local park. He and defendant exchanged greetings when they passed. According to Contreras, defendant was wearing all black, including a black hat with a yellow "P" on it (a Pittsburgh Pirates hat).[2]

Contreras later observed defendant walking away from the party and asked if he was leaving already. Defendant responded that he was going to be right back. When defendant returned, he was wearing gloves and was accompanied by two other young men.

At some point after Gallegos, Saldana, and Melendez had been at the party for about an hour, defendant approached Gallegos and said he wanted the nox tank.[3] Gallegos turned

---

[2] Nguyen did not recall what defendant was wearing when testifying at his later criminal trial. At the preliminary hearing, however, she similarly testified defendant was wearing all black, including a black baseball cap.

[3] At defendant's criminal trial, both Gallegos and Saldana identified defendant as the individual who demanded the nox tank. At the earlier preliminary hearing, however, Gallegos testified the person who approached him was 5' 3" and wearing a white t-shirt and a blue LA hat. Another partygoer, Hector Hernandez (Hernandez) was familiar with defendant from middle school and observed him approach people selling nox balloons, an apparent confrontation that ensued, and a point at which defendant reached down and lifted up his shirt. Hernandez's description of defendant's attire at the party also changed between the preliminary hearing and trial, however.

toward defendant and saw he had lifted up his waistband to display a gun. Melendez tackled defendant and Saldana moved to restrain defendant's arms to prevent him from reaching the gun. Horcasitas then approached Gallegos from behind and shoved him; Gallegos shoved Horcasitas back and said he wasn't going to let Horcasitas through because defendant had a gun. Horcasitas informed Gallegos he had a gun too, and pulled it from his waistband.

As Horcasitas approached, defendant yelled "blast these fools" at least three times. After first firing a shot at the ground, Horcasitas fired the gun at Gallegos but missed. Saldana, who had been trying to get defendant's gun away, stopped and turned around. Horcasitas then shot Saldana in the stomach, and Saldana fell to the ground. Melendez was still on the ground wrestling with defendant, and Horcasitas shot Melendez in the back. Defendant and Horcasitas then fled the scene.

West Covina Police Officer Laurie Pruitt arrived at Nguyen's house in response to a call about a party with an unknown disturbance. Officer Pruitt saw people running and screaming, and someone told her a partygoer had been shot. On her way to the home's backyard, Officer Pruitt encountered Saldana, who was holding his stomach and said he had been shot. While other officers attended to Saldana, Officer Pruitt entered the backyard and saw Melendez laying on the ground. He was in pain, and kept repeating "I'm dying" as officers attempted to assess and treat him.

Melendez eventually stopped breathing and the coroner later determined the cause of his death was the gunshot wound he sustained to his back. Saldana underwent surgery and

survived, but doctors were unable to remove the bullet in his body because it was too close to his spine.

### B. Additional Police Investigation

In the days that followed, police officers continued their investigation of the shooting and uncovered evidence of defendant's affiliation with the Puente 13 criminal street gang (Puente 13). From the room where defendant was living, a detective recovered a black Pittsburgh Pirates baseball cap, a DVD case with "Puente D St Gang" written on it, and a piece of paper inscribed with "Puente D" and "Gangster Loco." Another investigator reviewed the contents of defendant's cell phone and found his snapchat name was Gangster Loko. Defendant's Facebook page included photos of him making what appeared to be a "P" gang sign with his hands and included an exchange between him and another individual concerning the Duff Street clique of Puente 13.

The investigation also uncovered evidence regarding Horcasitas. Horcasitas was affiliated with a Puente 13 clique known as "Hurley." His moniker was Enemy. Horcasitas had two Facebook profiles, one of which included photos of him displaying a "P" gang sign while wearing a "Hurley" shirt and a Pittsburgh Pirates baseball cap.

The police also obtained messages between defendant and Jesus Mora, whose gang moniker was YG, that were sent the day after the murder. Mora's messages informed defendant, "You're good. You're cool." Investigators also uncovered messages between defendant and another man sent about twelve hours after the shooting; the other man asked defendant if he had talked to "Enemy."

In September 2016, police arrested defendant in connection with the shootings at Nguyen's home. Horcasitas was arrested the following April.

Law enforcement officers monitored and recorded a conversation an agent acting at the behest of the police had with Horcasitas while he was held in custody. During the conversation, Horcasitas discussed committing a murder and said "I seen one . . . of them, then I seen the other one was still fucken, I got him straight." Horcasitas also said "they didn't get at my homie." According to a transcription of the conversation, the agent asked, "What it involves, fool?" and Horcasitas replied, "Keep it gangster." An investigator who listened to the conversation both live and as recorded, however, testified he believed the agent asked, "What do they call that fool?" and Horcasitas replied, "Gangster."

Alexandria Tamayo, who was Horcasitas' on-again-off-again girlfriend, spoke to police officers in April 2017. During the interview, Tamayo was initially reluctant to provide the officers with any information. But she eventually admitted Horcasitas told her he saw "Gangster" getting beat up at the party and he shot two people to defend "Gangster" and himself.[4]

### C. Charges and Trial

In 2019, the People filed a criminal information against defendant and Horcasitas. The information charged them with

---

[4] At defendant's criminal trial, Tamayo testified she did not remember the conversation she described to the police and she maintained Horcasitas had not admitted anything about shooting people at a party.

one count of murder (as to Melendez) with an associated robbery-murder special circumstance allegation; two counts of attempted willful, deliberate, and premeditated murder (as to Saldana and Gallegos); and one count of attempted second degree robbery. The information alleged all four counts were committed for the benefit of, at the direction of, and in association with a criminal street gang. It further alleged a principal used a firearm in the commission of the murder and attempted murder counts.

Prior to the commencement of trial, Horcasitas asked the court to bifurcate the gang allegations, arguing in part that defendants had tattoos at the time of trial they did not have when the murder occurred and those tattoos had no bearing on whether or not they were guilty of the crime. Defendant joined in the request to bifurcate trial. The trial court denied the request, stating it believed gang evidence was admissible on issues of guilt as to the underlying offenses and the jury was entitled to consider it.[5]

During defendant's trial, exhibits and testimony were admitted concerning defendant's gang membership and the gang-relatedness of the charged offenses.

The People introduced photographs of the tattoos defendant had on his body at the time of trial.[6] He had a tattoo of the word

---

[5] Horcasitas subsequently entered a plea, but he remained unsentenced at the time trial commenced. Trial proceeded against defendant alone.

[6] The People also introduced photographs of Horcasitas' tattoos. At the time of his arrest, Horcasitas had two tattoos that appeared to indicate affiliation with Puente 13. Close to the time

7

"calle" on his wrist, a tattoo on the back of his hand that appeared to depict someone holding a firearm, the letter "P" and numbers "1" and "3" on the back of his head, a tattoo of the word "Duff" on his arm, and a large tattoo of the word "Puente" on his chest with skulls in the background.

Detective Eric Saavedra with the Los Angeles County Sheriff's Department testified as a gang expert. He summarized his experience with Puente 13 and described the structure of the gang, its history, geographical territory, rivals, and hierarchy.[7] He stated cliques within the gang, such as the Hurley clique and the Duff clique, are based on more specific geographic areas and members of different cliques routinely commit crimes together. He also explained Hispanic gangs like Puente 13 have "big homies," usually Mexican Mafia members in state prison, who are in charge of geographical areas. A younger gang member who obtains money is required to give a third of the proceeds to the big homie, a third of the proceeds to the gang, and may keep the final third.

Detective Saavedra testified that individual Puente 13 gang members advance within the gang hierarchy by "put[ting] in work" for the gang by doing things like committing robberies, thefts, or shootings. He described the importance of respect for the gang, and opined Puente 13's primary activities are stealing vehicles, carjackings, selling narcotics, assaults, robberies, and murders.

---

of trial, Horcasitas had additional tattoos apparently indicating the same.

[7]     Defendant stipulated Puente 13 is a criminal street gang within the meaning of section 186.22.

8

Detective Saavedra also testified about attire, signs, and tattoos related to Puente 13. He opined items found in defendant's room, including the Pittsburgh Pirates cap and the paper with writing on it, indicated allegiance to Puente 13. He also testified that Gangster Loko was a gang moniker. Regarding gang signs, Detective Saavedra testified that if a non-gang member were to "throw" gang signs, they would be confronted by the gang. Detective Saavedra further testified that if defendant posted the photos of himself displaying gang signs on social media without being a gang member, he would be shot.

Addressing defendant's tattoos, Detective Saavedra testified that in order to get a tattoo like the P13 on the back of defendant's head, one would have to be a Puente 13 gang member who put in substantial work, like robbery or assault. Gang members usually get big "stamps" like that through a violent act. A tattoo like the firearm on the back of defendant's hand would be earned by committing a violent act involving a firearm. A Duff street tattoo would be earned by putting in low-level work like narcotic sales, stealing cars, or selling nox balloons. The large Puente tattoo across the chest with skulls in the background would be earned by committing a violent act, such as assisting with a murder. If a gang member got such a tattoo without earning it, Detective Saavedra believed the member would be assaulted or killed.

The prosecutor also presented Detective Saavedra with two hypotheticals based on the facts of the case.

First, he asked Detective Saavedra to assume a Puente 13 gang member stole a nox tank in a robbery and asked the detective what the gang member would have to do to follow the gang's rules. Detective Saavedra responded the gang member

9

would have to fill and sell nox balloons, then give a third of the proceeds to the big homie, a third of the proceeds to the gang, and then keep a third for himself.  Detective Saavedra stated there would be severe consequences for not obeying the rule.

Second, the prosecutor gave Detective Saavedra a hypothetical tracking the evidence introduced at trial and Detective Saavedra opined the shootings and attempted robbery were committed in association with Puente 13, for the benefit of the gang (both by bolstering the gang's reputation and by potentially making money from taking the nox tank), and at the direction of Puente 13 (at least as to the shootings).  Detective Saavedra explained a hypothetical gang member who saw his fellow gang member getting beaten, was told to blast the attackers, and who did not aid the fellow gang member, would be viewed as a coward and would face retribution within the gang.

After the presentation of evidence, the jury was instructed with CALCRIM No. 1403 as follows:  "You may consider evidence of gang activity only for the limited purpose of deciding whether . . .[t]he defendant acted with the intent, purpose, and knowledge that are required to prove the gang-related crimes and enhancements charged; [t]he defendant had a motive to commit the crimes charged; [t]he defendant was the perpetrator of the crimes charged; OR . . . witness testimony is credible.  [¶]  You may not consider this evidence for any other purpose.  You may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime."

The jury deliberated and found defendant guilty on all counts.  The jury found all four offenses were committed for the benefit of, at the direction of, or in association with a criminal

10

street gang.  The jury additionally found true the charged firearm enhancements.

### D.     *Motion for New Trial and Sentencing*

In February 2022, prior to sentencing, defendant filed a motion for new trial arguing in pertinent part that enactment of section 1109 and amendments to section 186.22 made by Assembly Bill No. 333 (2021-2022 Reg. Sess.) (Assembly Bill 333) applied retroactively and warranted reversal of defendant's convictions and the associated gang allegations.  Defendant argued that under the newly enacted section 1109, he would have been entitled to a bifurcated trial on the gang allegations, that the introduction of the gang evidence during his trial was extremely prejudicial, and that the trial court should grant him a new trial on the substantive charges.  He further argued amendments to section 186.22 rendered the evidence presented at trial insufficient to support the gang enhancement true findings.

The trial court heard argument on defendant's motion for new trial just prior to sentencing.  The court agreed the changes in law applied to defendant because his case was not final. Because Assembly Bill 333 added elements to the enhancement that the jury had not considered, the trial court vacated and set aside the jury's gang enhancement true findings and the "principal armed" firearm enhancements that depended on the viability of the gang enhancements findings.[8]  The court

---

[8]     The court stated its ruling permitted the People an opportunity to request a separate trial to proceed on the gang

11

otherwise denied the motion for new trial, including the request to vacate his convictions because trial on the gang enhancements had not been bifurcated.  The court explained that even if a gang enhancement is bifurcated, that doesn't necessarily mean that gang evidence is inadmissible at the guilt phase on the substantive offenses because the evidence could come in for other reasons, including identity.

Proceeding to sentencing, the court imposed a sentence of 25 years to life for the murder conviction, noting that it was selecting this alternative penalty (§ 190.5, subd. (b)) based on defendant's age (16) at the time of the crime, the fact that he was not the actual killer, and a psychological evaluation submitted to the court.  As to the convictions for the attempted murders of Saldana and Gallegos, the court imposed consecutive sentences of life in prison with a minimum eligible parole date of seven years.  On the final attempted robbery conviction, the court imposed a two-year sentence, which it stayed pursuant to section 654.  The aggregate sentence, as described by the court, was accordingly 39 years to life in prison.  The court accepted the defense calculation of 2,002 days of custody credit.

## II.  DISCUSSION

We will assume for argument's sake that section 1109 applies to defendant retroactively because, even with that assumption, there is still no prejudice warranting reversal.  Our Supreme Court in *People v. Tran* (2022) 13 Cal.5th 1169 held that a decision not to bifurcate trial of a gang enhancement was

enhancement allegations if they wished to do so.  The People elected not to request a retrial.

harmless notwithstanding section 1109 because the evidence of guilt was strong and the defendant relied only on "describing the general risk of prejudice that may result from the admission of gang evidence" rather than explaining how the exclusion of gang evidence would have been reasonably likely to change the jury's guilty verdict on the underlying murder charge. (*Id.* at 1209-1210.) Analogously here, the gang evidence admitted at defendant's trial did not render it fundamentally unfair, the majority of the gang evidence admitted was relevant to the substantive charges, the evidence that would have been excluded at a bifurcated trial was not of a kind that would have inflamed the passions of the jury, and the other evidence of guilt on the substantive charges was strong. We will therefore affirm the judgment, albeit with a minor modification to make an uncontested correction to defendant's custody credits.

> ### A. Refusing to Bifurcate Trial of the Gang Enhancement Allegations Did Not Prejudice Defendant

Section 1109 requires a trial court, upon a defendant's request, to order that the crimes charged against him be tried separately from an alleged gang enhancement. (§ 1109, subd. (a).) As mentioned, we assume the provision applies retroactively to defendant and it was accordingly error not to grant his bifurcation request.

The trial court's denial of the defense request for bifurcation did not cause fundamental unfairness such that the *Chapman v. California* (1967) 386 U.S. 18 standard of assessing prejudice would apply, however. (*Tran*, *supra*, 13 Cal.5th at 1209.) The prosecution did not rely solely or even primarily on gang evidence to prove defendant's guilt. Rather, the prosecution

13

chiefly relied on testimony from partygoers and the two attempted murder victims who identified defendant as present at the party and as the person who demanded the nox tank just before the shootings. The prosecution also relied on Tamayo's statement to police recounting Horcasitas' admission and Horcasitas' statements to the police agent while held in custody.[9] The evidence of guilt here is comparable to that in *Tran* (*id.* at 1209 [trial not fundamentally unfair where prosecutor relied on "testimony and prior statements of a few key witnesses"]), and the state law standard for evaluating prejudice accordingly applies (*ibid.*).

To determine whether any error in the admission of evidence was prejudicial under that standard, we consider whether bifurcation "would have been reasonably likely to change the jury's verdict of guilt as to the underlying [offenses]." (*Tran*, *supra*, 13 Cal.5th at 1209.) We conclude it was not so likely for several reasons.

First, "[t]he case for guilt here was strong." (*Tran*, *supra*, 13 Cal.5th at 1209-1210.) Gallegos, Saldana, and Hernandez (who was previously acquainted with defendant) identified defendant as the individual who first approached the three victims and demanded the nox tank. Gallegos and Saldana also identified defendant as the individual who told Horcasitas to "blast these fools." Nguyen and Contreras's testimony corroborated defendant's presence at the party. Tamayo's prior conversation with the police, during which she related Horcasitas' statement that he shot two people to protect

---

[9]     Defendant does not challenge use of the statements to the police agent as evidence against him.

14

"Gangster" (defendant's moniker) also bolstered the proof that defendant was Horcasitas' accomplice.

Defendant, however, protests there was good evidence of mistaken identity and points to the differences between the various witness accounts of defendant's attire on the night of the murder. Defendant also highlights variances between Gallegos' physical description of defendant at the preliminary hearing and defendant's undisputed physical appearance. The discrepancies in the testimony regarding defendant's appearance and attire do not, however, materially undermine the testimony from the three witnesses to the altercation—Gallegos, Saldana, and Hernandez—all of whom unequivocally identified defendant at trial.[10] Under the circumstances, we do not think exclusion of the testimony bearing on the gang enhancement would have materially impacted defendant's mistaken identity theory.

Second, nothing in Assembly Bill 333 limits the introduction of gang evidence in a bifurcated proceeding where the gang evidence is relevant to the underlying charges. Much of the gang-related evidence admitted during defendant's trial would have been admitted anyway even if adjudication of the gang enhancement had been bifurcated. (*Tran*, *supra*, 13 Cal.5th at 1208 ["gang evidence, even if not admitted to prove a gang enhancement, may still be relevant and admissible to prove other facts related to a crime"]; *People v. Ramos* (2022) 77 Cal.App.5th

---

[10] This is particularly true since Gallegos and Hernandez's preliminary hearing descriptions of defendant's attire are generally consistent with each other, even if not consistent with Contreras's and Nguyen's descriptions. Defendant also did not impeach Saldana's trial testimony with any preliminary hearing inconsistent statements.

15

1116, 1132 ["nothing in Assembly Bill 333 limits the introduction of gang evidence in a bifurcated proceeding where the gang evidence is relevant to the underlying charges"]; see also *People v. Hernandez* (2004) 33 Cal.4th 1040, 1049 ["[E]vidence of gang membership is potentially prejudicial and should not be admitted if its probative value is minimal. [Citation.] But evidence of gang membership is often relevant to, and admissible regarding, the charged offense. Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime"].)

As defendant admits, his gang moniker and his association with Horcasitas through the gang would have been admissible in a bifurcated trial. But contrary to his claim that very little, if any, other evidence was relevant to the charged substantive offenses, much of it was. Consider just a few examples. Evidence that members of different cliques routinely commit crimes together was relevant to defendant's intent, namely his understanding that if he ordered Horcasitas to "blast" the victims, Horcasitas would shoot them. Evidence related to the financial structure of the gang was relevant to the motive for defendant's attempt to obtain the nox tank and his reason for instigating the altercation that led to the murder. Evidence of his gang membership, including at least some of the photos in which he was displaying gang signs, was relevant to establishing his motive for committing the crimes and his identity as one of the two felony murderers. (See, e.g., *People v. Duong* (2020) 10 Cal.5th 36, 64 [court did not prejudicially err in admitting gang

16

evidence where "there was little question that evidence of defendant's gang membership was relevant to motive" and "gang affiliation evidence gave context to the shooting"].)  Evidence regarding at least some of defendant's gang tattoos, their significance, and the repercussions for obtaining tattoos one had not earned were all relevant to defendant's motive and consciousness of guilt.  (*People v. Ochoa* (2001) 26 Cal.4th 398, 438 ["187" tattooed on defendant's forehead manifested consciousness of guilt].)  Evidence regarding gangs' treatment of "snitches" was relevant to Tamayo's credibility, given that her statement at trial conflicted with her prior statements to police officers.  (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1168-1169 [gang evidence may be relevant to witnesses' reluctance to testify and inconsistent statements].)

That is not to say, of course, that the entirety of the gang evidence presented would have been admitted in a bifurcated trial.  The testimony regarding Puente 13's active "war" with rival Blackwood, for instance, had little bearing on proof of the murder, attempted murder, and attempted robbery offenses.  But the evidence that likely would have been excluded at a bifurcated trial as irrelevant was for the same reason minimally impactful. Evidence of the conflict with Blackwood or evidence of predicate offenses for the gang enhancement statute was no more graphic or inflammatory than the evidence admissible on the substantive offenses.  And any danger from presentation of marginally inadmissible gang evidence was further mitigated by the limiting instruction the trial court gave, which enumerated the specific reasons gang evidence could be considered and prohibited the jury from considering the gang evidence for any other purpose or

17

from using the evidence to conclude "defendant is a person of bad character" or had "a disposition to commit crime."

We therefore conclude it is not reasonably likely the failure to bifurcate trial of the gang enhancements affected the jury's guilty verdicts and any error was accordingly harmless.

> B. *Defendant Is Entitled to One Additional Day of Presentence Credit*

Defendant argues that he is entitled to 2,003 days of presentence credit rather than the 2,002 days he was awarded at sentencing. Defendant is correct that, when both the arrest date and sentencing date are included, there are 2,003 days between his September 1, 2016, arrest and his February 24, 2022, sentencing hearing. The Attorney General concedes he should have been awarded the additional day, and we agree. (*People v. Rajanayagam* (2012) 211 Cal.App.4th 42, 48 [a defendant is entitled to all days, including partial days, of custody in county jail and residential treatment facilities from the day of the arrest to and including the day of sentencing].) We will modify the judgment accordingly.

## DISPOSITION

The judgment is modified to reflect that defendant has 2,003 days of presentence custody credits.  The trial court is directed to forward an amended abstract of judgment reflecting this modification to the Department of Corrections and Rehabilitation.  As so modified, the judgment is affirmed.


NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS



BAKER, J.

We concur:


RUBIN, P. J.


KIM, J.


19